Rita Lynn BAKER, Plaintiff,

v.

JOHN MORRELL & CO., Defendant.

No. C01–4003–MWB.

United States District Court,
N.D. Iowa,
Western Division.

June 11, 2003.

Jay Elliot Denne, Munger, Stanley E. Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Gary P. Thimsen, Melanie L. Carpenter, Woods, Fuller, Shultz & Smith, PC, Sioux Falls, SD, Leslie R. Stellman, Hodes, Ulman, Pessin & KIatz, PA, Towson, MD, Scott C. Folkers, Scott Folkers Law Firm, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION TO RECONSIDER ALLOCATION OF DAMAGES AND, IN THE ALTERNATIVE, MOTION TO RECONSIDER RULING ON PLAINTIFF'S MOTION TO AMEND COMPLAINT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 916

II. PLAINTIFF'S MOTION TO RECONSIDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917
 A. Factual and Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917
 B. Applicable Standards Governing Plaintiff's Motion to Reconsider . . . . . . . . . 918
 1. Rule 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918
 2. Rule 60(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 919
 C. Federal Rule of Civil Procedure 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 921
 1. Did Baker plead her ICRA claims out of court? . . . . . . . . . . . . . . . . . . 922
 2. Rule 10(b)'s effect on Baker's Rule 8 argument . . . . . . . . . . . . . . . . . . 925
 D. Federal Rule of Civil Procedure 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 926
 E. Federal Rule of Civil Procedure 54(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 929
 1. Mandatory nature and purpose of Rule 54(c) . . . . . . . . . . . . . . . . . . . 929
 2. "Unfairly prejudicial" exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 930
 a. Did Baker prove her ICRA claims? . . . . . . . . . . . . . . . . . . . . . . . 930
 b. Does the ICRA's absence of a damages cap unfairly prejudice John Morrell? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 931
 3. Are the ICRA claims a separate "theory" or "issue"? . . . . . . . . . . . . . . 933

III. DEFENDANT'S MOTION TO AMEND THE JUDGMENT . . . . . . . . . . . . . . . . . . . . 939

A. Allocation of Compensatory Damages to ICRA Claims . . . . . . . . . . . . . . . . . . . 939
B. Emotional Distress Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 942
 1. Sufficiency of the evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 942
 a. Applicable standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 942
 b. Baker's evidence of emotional distress and causation . . . . . . . . . . . . 943
 2. Excessive verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 944
 a. Applicable standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 944
 b. Do Baker's awards shock the conscience? . . . . . . . . . . . . . . . . . . . . . . 945
C. Pre–Judgment Interest on State–Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 948
D. Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 949
 1. Applicable standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 950
 2. Malice or reckless indifference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 951
 3. Good faith efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 959
 4. Amount of punitive damages award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 960
 a. Application of statutory damages cap provision . . . . . . . . . . . . . . . . . 960
 b. Excessive verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 960

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 963

## I. INTRODUCTION

This matter is before the court on the plaintiff's March 28, 2003 Motion to Reconsider Allocation of Damages and, in the Alternative, Motion to Reconsider Ruling on Plaintiff's Motion to Amend Ruling. (Doc. No. 184). In her motion, Baker urges the court to reconsider its March 17, 2003 Memorandum Opinion and Order denying her Motion to Amend Complaint. In that order, the court found that Federal Rule of Civil Procedure 15(b) did not impart the court with authority under the facts of this case to grant amendment. Because of the lack of prejudice to the defendant in this case, the court was inclined to grant the amendment but ultimately determined that Rule 15(b) did not authorize amendment.

Nevertheless, on November 27, 2002, the court directed the parties to brief the allocation of damages, assuming the court were to grant the plaintiff's motion to amend. (Doc. No. 140). On December 20, 2002, the plaintiff responded to the court's order (Doc. No. 161), and, in her brief, Baker made the following observation without any legal citation, invocation of a procedural rule, or further support:

As an initial matter, Baker submits that the Court does not necessarily need to grant the Motion to Amend to allocate damages to claims based on Iowa law. Baker believes that her original Complaint puts John Morrell on notice of her state law claims because the Complaint specifically references the fact that she filed a charge with the Iowa Civil Rights Commission, that a right to sue letter had been issued by the Iowa Civil Rights Commission, and that the Complaint was filed within 90 days of the right to sue letter.

(Doc. No. 161).

In her Motion to Reconsider, the plaintiff asks the court to address this argument, which she now frames in terms of Federal Rule of Civil Procedure 8, which establishes the liberal notice pleading standards. Baker initially moved to amend her complaint under Federal Rule of Civil Procedure 15, and the parties were in agreement that Rule 15 governed. This is the rule upon which the court's March 17, 2003 Order was based. The issue in this Motion to Reconsider is not squarely controlled by case law as it developed under any single Federal Rule of Procedure. The court, instead, must resolve this motion by looking at a combination of Rules, including Rules 8, 15, and 54(c), to determine whether Baker's request to add par-

allel state-law claims is appropriate in this novel set of circumstances.

## II. PLAINTIFF'S MOTION TO RECONSIDER

### A. Factual and Procedural Background

Because the court has addressed in detail the jury's findings and the factual background of this case, the court, in the present Order, will not repeat them in their entirety here, instead providing only a brief background of this employment discrimination lawsuit.

This sex discrimination case arose out of Rita Baker's ("Baker") employment with the defendant, John Morrell & Co. ("John Morrell"), as a Computer Scale Operator in the defendant's Sioux City, Iowa meat packaging plant. Baker began her employment at John Morrell in 1984, and she continued to work for John Morrell until April of 2001. She initiated this lawsuit, claiming that she was constructively discharged, subjected to disparate treatment and a sexually hostile work environment, and retaliated against for challenging the sexual discrimination she endured at John Morrell—all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

The case was tried to a jury for seven days, beginning on September 23, 2002. The case was submitted to the jury in the late afternoon of October 1, 2002. The following afternoon, on October 2, 2002, the jury returned its verdict. It found in favor of Baker on her claims of sexual harassment and retaliation. The jury also found on both of these claims that Baker was constructively discharged, and, pertinent to her retaliation claim, the jury found that John Morrell had failed to prove its "same decision" defense. On Baker's claim of disparate treatment, the jury found in favor of John Morrell.

The jury awarded the following damages for John Morrell's wrongful conduct: On her claim of sexual harassment, $250,000.00 for past emotional distress and $50,000.00 for future emotional distress; on her retaliation claim, $75,000.00 for past emotional distress and $10,000.00 for future emotional distress. The jury also awarded $150,000.00 for past emotional distress and $200,000.00 for future emotional distress for Baker's constructive discharge. Moreover, the jury awarded $14,470.24 for Baker's past medical expenses and $90,000.00 for future medical expenses on her sexual harassment claim. The jury also found that Baker was entitled to a $33,314.73 award for backpay. Finally, the jury assessed a sizable punitive damages award against John Morrell: $600,000.00 for sexual harassment and $50,000.00 for retaliation. The Clerk of Court entered judgment in the amount of $1,522,784.97 on October 2, 2002.

A flurry of post-trial motions followed the trial, the majority of which this court resolved in an Order, dated March 17, 2003. Front pay, attorney's fees, costs and expenses were awarded in an Order, dated May 21, 2003. Pertinent to this motion, in its March 17, 2003 Order, the court denied Baker's Motion to Amend Complaint, in which she sought to add retaliation and hostile-work-environment claims under the Iowa Civil Rights Act ("ICRA"), Iowa Code ch. 216. The ICRA is Iowa's parallel anti-discrimination counterpart to Title VII. The import of such an amendment is clear: only by adding a state-law claim on her sexual harassment and retaliation claims can she escape the Title VII damages liability cap, which, in this case, is $300,000.00.

The court held a telephonic hearing on the plaintiff's motion on May 14, 2003. At

this hearing, the plaintiff was represented by her lead counsel Stanley Munger of Munger, Reinschmidt & Denne, Sioux City, Iowa. The defendant was represented by Leslie Stellman of Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland, and by Scott Folkers, in-house counsel for John Morrell in Sioux Falls, South Dakota.

### B. Applicable Standards Governing Plaintiff's Motion to Reconsider

Baker's motion fails to identify the authority for a motion to reconsider. The Eighth Circuit Court of Appeals commented on the "dangers of filing a self-styled 'motion for reconsideration' that is not described by any particular rule of federal civil procedure," and identified the usual bases upon which such motions are construed to have been made in *Sanders v. Clemco Indus.*, 862 F.2d 161 (8th Cir. 1988):

> Federal courts have construed this type of motion as arising under either Rule 59(e) (motion to alter or amend the judgment) or Rule 60(b) (relief from judgment for mistake or other reason). *See Spinar v. South Dakota Bd. of Regents*, 796 F.2d 1060, 1062 (8th Cir.1986). The two rules serve different purposes and produce different consequences, both substantive and procedural. *See A.D. Weiss Lithograph Co. v. Illinois Adhesive Prods. Co.*, 705 F.2d 249, 249–50 (7th Cir.1983) (per curiam). When the moving party fails to specify the rule under which it makes a postjudgment motion, that party leaves the characterization of the motion to the court's somewhat unenlightened guess, subject to the hazards of the unsuccessful moving party losing the opportunity to present the merits underlying the motion to an appellate court because of delay.

*Sanders*, 862 F.2d at 168 (footnotes omitted).

The court's "somewhat unenlightened guess" here is that the motion, filed within ten days after the judgment, was intended to be made pursuant to Rule 59(e). *See Sanders*, 862 F.2d at 168–69 (distinguishing between of a motion filed within ten days of the judgment, deemed to be made pursuant to Rule 59(e), and one made later, deemed to be made pursuant to Rule 60(b)). Baker has done nothing to discount John Morrell's construction of the motion as having been made pursuant to that rule. Although the court will first consider the standards for a motion made pursuant to Rule 59(e), as the most likely authority upon which Baker's motion to reconsider is based, the court will also consider the standards applicable to a motion made pursuant to Rule 60(b). In this case, however, both Rules provide a permissible basis for plaintiff's motion.

### 1. Rule 59(e)

The language of Rule 59(e) provides only a deadline for motions "to alter or amend," without specifying the standards for alteration or amendment. *See* FED. R. CIV. P. 59(e). Because Baker's motion was timely under Rule 59(e), the court will consider Rule 59(e) as a possible authority for the plaintiff's motion. *See Arnold v. Wood*, 238 F.3d 992, 998 (8th Cir.), *cert. denied*, 534 U.S. 975, 122 S.Ct. 400, 151 L.Ed.2d 304 (2001); *Garrett v. United States*, 195 F.3d 1032, 1033 (8th Cir.1999). The Eighth Circuit Court of Appeals has filled in the substantive standards for a motion to "alter or amend" pursuant to Rule 59(e). Under Rule 59(e), the court may alter or amend its judgment only if it finds a "manifest" error of law or fact in its ruling. *See Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir.1988) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.), *as amended*, 835 F.2d 710 (7th Cir.1987), quoting in turn *Keene Corp. v. Interna-*

*tional Fidelity Insurance Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir.1984)). More specifically,

> Federal Rule of Civil Procedure 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment. *Norman* [*v. Arkansas Dep't of Educ.*], 79 F.3d [748,] 750 [(8th Cir.1996)] (citing *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982)). Rule 59(e) motions serve a limited function of correcting " 'manifest errors of law or fact or to present newly discovered evidence.'" *Hagerman*, 839 F.2d at 414 (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.), *as amended*, 835 F.2d 710 (7th Cir.1987)). Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment. *Id.*

*Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir.1998). Denial of a Rule 59(e) motion is reviewed for abuse of discretion and the district court abuses its discretion, for example, when it makes an error of law or an erroneous factual finding. *See Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1070 (8th Cir.2000); *Roark v. City of Hazen, Ark.*, 189 F.3d 758, 761 (8th Cir.1999). As will become evident in considering the merits of Baker's motion, the court finds "manifest error" of law requiring it to "alter or amend" the judgment in this case. Specifically, the court determined in its March 17, 2003 Order that it lacked the authority to grant amendment and award relief under the ICRA, but upon further consideration, the court has concluded that the Federal Rules of Civil Procedure indeed authorize the relief that the plaintiff seeks.

## 2. Rule 60(b)

Rule 60(b) authorizes the district court to revisit a final judgment, order, or proceeding and to grant relief to the movant under six specifically enumerated circumstances. Pertinent to this Motion to Reconsider is the sixth category listed, known as the catch-all provision: "[T]he court may relieve a party . . . from a final judgment . . . for . . . (6) any other reason justifying relief from the operation of the judgment." FED. R. CIV. P. 60(b)(6). The Supreme Court has described Rule 60(b)(6) as a rule that "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 614–15, 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 266 (1949). Similarly, the Court of Appeals for the Eighth Circuit has stated that "[t]his rule may be liberally construed to do substantial justice to allow parties to air meritorious claims in the absence of fault or prejudice." *In re Kirwan*, 164 F.3d 1175, 1177 (8th Cir.1999) (citing *MIF Realty L.P. v. Rochester Assocs.*, 92 F.3d 752, 756–57 (8th Cir.1996)).

The Court of Appeals for the Eighth Circuit has succinctly explained the standards governing Rule 60(b) motions to reconsider as follows:

> Federal Rule of Civil Procedure 60(b) provides that the court may relieve a party from a final judgment for, among other reasons, mistake, inadvertence, surprise, or excusable neglect. A Rule 60(b) motion is committed to the sound discretion of the trial court, and we review the district court's decision to grant or deny the motion only for an abuse of discretion. *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 515 (8th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). " 'Abuse of discretion occurs if the dis-

trict court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions.'" *Hosna v. Groose,* 80 F.3d 298, 303 (8th Cir.1996) (quoting *International Ass'n of Machinists & Aerospace Workers v. Soo Line R.R.,* 850 F.2d 368, 374 (8th Cir.1988) (en banc), *cert. denied,* 489 U.S. 1010, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989)), *petition for cert. filed* (U.S. June 28, 1996) (No. 95–9498). Although we have said that Rule 60(b) motions are disfavored, we also recognize that they "serve a useful, proper and necessary purpose in maintaining the integrity of the trial process, and a trial court will be reversed where an abuse of discretion occurs." *Rosebud Sioux Tribe,* 733 F.2d at 515.

*MIF Realty L.P. v. Rochester Assocs.,* 92 F.3d 752, 755 (8th Cir.1996); *accord Bennett v. Dr. Pepper/Seven Up, Inc.,* 295 F.3d 805, 807 (8th Cir.2002) ("We will reverse a district court's ruling on a Rule 60(b) motion only if there was a clear abuse of the court's broad discretion.") (citing *Roark v. City of Hazen, Ark.,* 189 F.3d 758, 761 (8th Cir.1999)).

■ "Under Rule 60(b) the movant must demonstrate exceptional circumstances to justify relief." *Brooks v. Ferguson–Florissant Sch. Dist.,* 113 F.3d 903, 904 (8th Cir.1997) (citing *Atkinson v. Prudential Prop. Co.,* 43 F.3d 367, 371 (8th Cir.1994)); *see, e.g., Cornell v. Nix,* 119 F.3d 1329, 1332–33 (8th Cir.1997) (Rule 60(b)(6) authorizes relief in "extraordinary circumstances"). Exceptional circumstances exist where the judgment bars adequate redress. *Atkinson,* 43 F.3d at 373.

■ While relief under Rule 60(b) is "extraordinary," a Rule 60(b) motion is "committed to the sound discretion of the trial court." *MIF Realty,* 92 F.3d at 755. As the Eighth Circuit Court of Appeals explained,

Rule 60(b) is to be given a liberal construction so as to do substantial justice and " 'to prevent the judgment from becoming a vehicle of injustice.'" *Id.* (quoting *United States v. Walus,* 616 F.2d 283, 288 (7th Cir.1980)). This motion is grounded in equity and exists "to preserve the delicate balance between the sanctity of final judgments ... and the incessant command of a court's conscience that justice be done in light of all the facts." *Id.* (internal quotations omitted) (alterations in original). *See also* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2857, at 255 (2d ed. 1995) ("Equitable principles may be taken into account by a court in the exercise of its discretion under Rule 60(b).").

*MIF Realty,* 92 F.3d at 755–56. Although Rule 60(b) motions are "disfavored," the Eighth Circuit Court of Appeals has also "recognize[d] that they 'serve a useful, proper and necessary purpose in maintaining the integrity of the trial process, and a trial court will be reversed where an abuse of discretion occurs.'" *Id.* at 755 (quoting *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 515 (8th Cir.1984)). An "abuse of discretion" occurs "if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions." *Id.* (internal quotation marks omitted) (quoting *Hosna v. Groose,* 80 F.3d 298, 303 (8th Cir.1996), in turn quoting *International Ass'n of Machinists & Aerospace Workers v. Soo Line R.R.,* 850 F.2d 368, 374 (8th Cir.1988) (en banc)).

In this case, the plaintiff moved under Rule 15 to amend her complaint in order to plead parallel state-law causes of action. The court denied that motion, finding that the situation at hand did not fit neatly into

Rule 15 case law as it has developed. Rule 15(b) mandates that:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings ... may be made upon motion of any party, at any time, even after judgment....

FED. R. CIV. P. 15(b). In this case, the plaintiff sought to amend her complaint to inject *claims*, not issues or theories, that had been raised in the pleadings—retaliation and sexual harassment—albeit by way of a cause of action that was not cited in the complaint.

It is this fine-line distinction between causes of action and claims that the drafters of the Federal Rules of Civil Procedure sought to abolish in promulgating the Federal Rules in 1938. *See* 5 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1216 (1990) (footnotes omitted). In Baker's complaint, she specifically averred a cause of action under Title VII. Yet, the factual allegations contained in her complaint also support claims under Iowa's parallel anti-discrimination statute, the ICRA. The Federal Rules exalt substance over form, and the "exceptional circum-stance" in this case is the court's initial failure to perceive the impact of this distinction on its authority to grant post-trial relief to the plaintiff.

## C. Federal Rule of Civil Procedure 8

■ The first ground asserted in Baker's Motion to Reconsider is that an amendment to her complaint was unnecessary because the facts alleged in her complaint supported claims under the ICRA and put John Morrell on notice of those state-law claims.[1] Under Rule 8(a)(2), pleading need consist only of "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has elaborated on this bare-bones standard and held that the Federal Rules require the complaint to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Some time ago the Court of Appeals for the Eighth Circuit explained the function of this simple form of "notice pleading":

> "The only function left to be performed by the pleadings alone is that of notice. For these reasons, pleadings under the rules may properly be a generalized summary of the party's position, sufficient to advise the party for which incident he is being sued, sufficient to show what was decided for purposes of res

---

1. John Morrell argues that Baker's Rule 8 argument is untimely. Baker, however, asserts that a passing mention of the liberality of notice pleading sufficed to preserve her argument. Specifically, on November 27, 2002, the court ordered the parties to submit briefs regarding the allocation of damages assuming the court were to grant the plaintiff's Motion to Amend Complaint. (Doc. No. 140). On December 20, 2002, the plaintiff filed her brief and, before addressing allocation, stated: "Baker submits that the Court does not necessarily need to grant the Motion to Amend to allocate damages to her claims based on Iowa law. Baker believes that her original Complaint puts John Morrell on no-tice of her state claims because the Complaint specifically references the fact that she filed a charge with the Iowa Civil Rights Commission, that a right to sue letter had been issued by the Iowa Civil Rights Commission, and that the Complaint was filed within 90 days of the right to sue letter." (Doc. No. 161).

It is this statement that Baker argues preserved her Rule 8 argument on this motion to reconsider and which she contends the court should have construed as a Rule 8 argument that the court should have, *sua sponte*, addressed. As will become evident, the court need not rule on whether or not Baker preserved her Rule 8 argument.

judicata, and sufficient to indicate whether the case should be tried to the court or to a jury. No more is demanded of pleadings than this. . . ."

*Century '21' Shows v. Owens*, 400 F.2d 603 (8th Cir.1968) (quoting 1A BARRON & HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE, § 251, at 29 (1960)); *see also Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 699 (8th Cir.2003) ("Even the liberal standards of notice pleading require some factual allegations that state a cause of action and put a party on notice of the claim against it.") (citing *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir.1999)). As one Fifth Circuit judge poignantly observed,

> Ancestor worship in the form of ritualistic pleadings has no more disciples. The time when the slip of a sergeant's quill pen could spell death for a plaintiff's cause of action is past. Under Federal Rules of Civil Procedure, a complaint is not an anagramatic exercise in which the pleader must find just exactly the prescribed combination of words and phrases.

*Thompson v. Allstate Insurance Co.*, 476 F.2d 746, 749 (5th Cir.1973).

Baker's motion and the defendant's resistance raise interesting questions of first impression for this court. They are: (1) whether Baker pleaded her ICRA claims out of court by specifically averring a cause of action under Title VII, 42 U.S.C. § 2000e-5 *et seq.*, omitting any citation to the ICRA, Iowa Code ch. 216; and, if not, (2) whether her claims under the ICRA can be added post-trial despite the fact she did not intend to bring the parallel claims until the jury returned a sizeable verdict well in excess of Title VII's statutory damages cap.

### 1. Did Baker plead her ICRA claims out of court?

Under Rule 8, as noted above, all that is required of a pleading is a short and plain statement showing the plaintiff is entitled to relief. FED. R. CIV. P. 8(a)(2). While a plaintiff is entitled to go beyond this simple requirement and plead additional facts, it is well-established that if the plaintiff chooses to provide additional facts, beyond the short and plain statement requirement, the plaintiff cannot prevent the defendant from suggesting that those same facts demonstrate the plaintiff is not entitled to relief. *E.g., Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002) (" '[W]hile notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition.' ") (quoting *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir.1998)) (citing *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 261 (7th Cir.1998) ("[p]laintiffs pleaded themselves out of court on the fraud theory.")); *Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th Cir.1995) ("More is not necessarily better under the Federal Rules; a party 'can plead himself out of court by . . . alleging facts which . . . demonstrate that he has no legal claim.' ") (quoting *Trevino v. Union Pac. R.R. Co.*, 916 F.2d 1230, 1234 (7th Cir.1990)). Indeed, a complaint need not even cite any law in order to pass muster under the liberal pleading standards. *E.g., Bennett v. Schmidt*, 153 F.3d 516, 517 (7th Cir.1998). But, this is not a case where the plaintiff failed to cite a statute or cited the wrong statutory provision. The court is confident that these variables distinguish Baker's case from the myriad cases interpreting the liberal pleading standards.

The cases cited by the plaintiff, as well as the plethora of cases this court has reviewed in the course of its research on this issue, address Rule 12(b)(6) motions to dismiss where the defendant argues that the plaintiff has not stated any cause of action upon which relief could be granted

or the plaintiff cited the wrong statute. In those situations, courts should not dismiss a complaint if the facts alleged in the complaint would support a cause of action, irrespective of whether or not the plaintiff invoked the correct statutory provision. The question in this case is more complex than the plaintiff's argument would have the court believe: By citing a correct federal statutory ground for relief to the exclusion of state law, should the court (and the defendant) assume that, because relief is also available under a separate, but parallel, state statute, the plaintiff's action is brought under state law as well?

In answering this question, which the plaintiff frames in terms of Rule 8, the court is guided by the firmly established principle that "pleadings must be construed liberally in order to prevent errors in draftsmanship or the like from barring justice to litigants. Such pleadings must be construed favorably to the pleader and judged by substance rather than form." *Mutual Creamery Insurance Co. v. Iowa Nat'l Mut. Insurance Co.*, 427 F.2d 504, 507–08 (8th Cir.1970). Still, the court cannot find that Baker's complaint encompassed claims under the ICRA because, as the court found in its March 17, 2003 Order, the plaintiff herself did not even intend for such state-law claims to be brought until after the verdict was reached in this case.

She clearly pleaded sufficient facts that would put John Morrell on notice of her sexual discrimination claims, irrespective of the particular state or federal statute under which they arose. Absent the explicit reference to Title VII, the court would have little difficulty concluding that John Morrell was on notice of Baker's federal and state law claims because of the parallel nature of the claims and because of Baker's references in her complaint to both the Equal Employment Opportunity Commission ("EEOC") and the Iowa Civil Rights Commission ("ICRC"). In addition, her complaint indicates that she filed discrimination charges with both the EEOC and the ICRC and that she received right-to-sue letters from both agencies, as well. Her charges and right-to-sue letters were attached as exhibits to her complaint.

Nevertheless, Baker's specific assertion of a particular statutory entitlement for relief, *i.e.*, Title VII, suspends her ability to claim that she also impliedly pleaded sex discrimination in violation of the ICRA. As the defendant points out, plaintiff's decision to invoke federal but not state law prompts application of a well-known principle of statutory construction, *inclusio unius est exclusio alterius*—the inclusion of one is the exclusion of others. Moreover, plaintiff's counsel is among the top civil rights attorneys in the state of Iowa. As such, the court awarded him a premium hourly rate in the plaintiff's request for attorney's fees. The court is certain he is well aware of the parallel nature of the ICRA claims and of the impact on a plaintiff's recovery that a state-law claim can have. Given his skill, knowledge, and experience, the court is hard-pressed to assume that his failure to plead the ICRA was an error in draftsmanship.

In addition, and perhaps more importantly, Baker's choice to invoke federal law but not state law was just that—her choice. Under the well-pleaded complaint rule, the plaintiff is the master of her complaint. The Sixth Circuit has stated that "the fact that the wrong asserted could be addressed under either state or federal law does not ordinarily diminish the plaintiff's right to choose a state law cause of action." *Alexander v. Electronic Data Sys. Corp.*, 13 F.3d 940, 943 (6th Cir.1994) (citing *Franchise Tax Bd. v.*

*Construction Laborers Vacation Trust,* 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908)). In *Alexander v. Electronic Data Systems Corp.,* 13 F.3d 940 (6th Cir.1994), a rejected job applicant brought a hiring discrimination suit in state court. The defendant sought to remove the lawsuit to federal court on the ground the plaintiff's claims " 'relate to' a plan covered by the Employment Retirement Income Security Act" (ERISA), and "conflict directly with an ERISA cause of action," and therefore invoke federal question jurisdiction. *Id.* at 942 (quoting district court). While a dissertation on ERISA preemption is well beyond the scope of this Order, it suffices to say that the court was called upon to address whether a preemption defense under ERISA section 1144 conferred federal question jurisdiction upon the district court. *Id.* at 943. Concluding that it did not and reversing the district court, the *Alexander* court noted that the district court was hesitant to find federal question jurisdiction because of its respect for the well-pleaded complaint rule. *Id.*

The United States District Court for the Northern District of Ohio recently applied the *Alexander* holding to a case that is somewhat analogous to Baker's case. In *Strong v. Print U.S.A., Ltd.,* 230 F.Supp.2d 798 (N.D.Ohio 2002), a civil rights plaintiff filed suit in state court, alleging four counts. Each count involved the plaintiff's allegations of sex discrimination, and Counts One, Two, and Three each specifically invoked Ohio law. *Id.* at 798–99. Count Four, however, alleged violation of public policy and cited state and federal law, specifically Title VII, as sources of that policy. *Id.* at 799. Moreover, under Count Four, the plaintiff sought recovery of attorney's fees and costs pursuant to Title VII. *Id.*

The defendant employer sought to remove the lawsuit to federal court pursuant to 28 U.S.C. § 1441(b), which allows for the removal of actions " 'of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States.' " *Id.* (quoting 28 U.S.C. § 1441(b)). The defendant argued that the request for attorney's fees under Title VII implied that the plaintiff's action was brought pursuant to Title VII. *Id.* The district court refused to infer that the plaintiff's action was brought pursuant to federal law because, as the plaintiff, she was entitled to choose state law despite the fact federal law also provided an avenue through which to seek redress of the alleged wrong. *Id.* Her references to Title VII did not convert her state-law claims into ones arising under federal law. *Id.* Because resolution of a federal question was not essential to her state-law claims, the court refused to infer the existence of a federal statutory claim and held that the plaintiff's lawsuit did not present a question of federal law. *Id.*

While *Alexander* and *Strong* arose in the context of removal jurisdiction, the principles they highlight apply in full force in the context of Baker's case. The Supreme Court has similarly stated that "the party who brings a suit is master to decide what law [she] will rely upon." *Franchise Tax Bd.,* 463 U.S. at 12, 103 S.Ct. 2841. In her complaint, Baker relied only on federal law, but she now urges the court to infer that her claims were also brought under the ICRA. Like the *Strong* court, this court cannot imply that Baker's claim was brought under any law other than that upon which she specifically relied.

Moreover, the court found in its March 17, 2003 Order that Baker did not intend to bring her lawsuit under the ICRA until

the jury returned a verdict in excess of the statutory damages cap. Baker did not challenge that finding in this Motion to Reconsider, and the court continues to stand by the accuracy of that finding. The court does not know whether this lack of intent was based on a strategic decision or was merely a failure to perceive the potential recovery in this case. Whatever the source of her failure to bring her claims pursuant to the ICRA, Rule 8 cannot be summoned to relieve its master of the consequences of her decision to bring her lawsuit under Title VII and not under the ICRA. As the master of her complaint, Baker made her legal bed when she chose to bring her lawsuit only under Title VII and, barring other relief, she must now lay in it.

### 2. *Rule 10(b)'s effect on Baker's Rule 8 argument*

Baker also argues that Rule 10(b) of the Federal Rules of Civil Procedure does not require her to set out separate counts to seek relief under separate statutory provisions. Thus, she claims that she was under no obligation to replead her Iowa law claims as separate counts. Rule 10(b) provides,

> All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

FED. R. CIV. P. 10(b).

The court does not disagree with the plaintiff's assertion that a plaintiff may combine state and federal claims in a single count, imprudent as the practice of doing so may be. *See, e.g., Federal Deposit Insurance Corp. v. Miller,* 781 F.Supp. 1271, 1278 n. 5 (N.D.Ill.1991) (summarily rejecting defendant's argument that plaintiff failed to comply with Rule 10(b) by combining state and federal claims in a single count). However, Baker did not merely set out a cause of action under each of her counts without invoking any law as she would have the court believe. Each of the counts of her complaint "repleads" the preceding paragraphs "as if fully set out" in each specific count. [Pf.'s Cmplt. Doc. No. 1]. By doing so, each count incorporates the first paragraph, which states that "[t]his action is based on the provisions of 42 U.S.C. Section 2000e *et seq.,* commonly referred to as the Civil Rights Act of 1964 and all amendments thereto. Subject matter jurisdiction is conferred upon this Court by 42 U.S.C. Section 2000e–5(f)." [Pf.'s Cmplt. Doc. No. 1]. The second paragraph similarly cites Title VII in support of its assertion that venue is proper. Moreover, while the court does not consider this persuasive, it bears noting that Baker seeks punitive damages, which are available only under federal law, in each of her counts, in addition to seeking costs and attorneys fees pursuant to federal law. Therefore, the harsh consequences of Baker's choice to bring her claims only under Title VII, prompting application of the statutory damages cap, cannot be avoided by Rule 10(b)'s lax standard of pleading.

In her brief, the plaintiff did not cite any Rule 10(b) case law, instead simply referencing a portion of 5 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1324 (1990). The Rule 10(b) cases cited therein do not stand for the proposition that plaintiff's state-law claims were impliedly subsumed by their counts which

averred violations of Title VII. The court has reviewed each of the cases cited in the pertinent portion of the treatise cited by the plaintiff, and in each of those cases, the plaintiffs specifically alleged violations of separate statutes but combined those allegations into a single count. *E.g., Michigan Gas & Elec. Co. v. American Elec. Power Co.,* 41 F.R.D. 462, 463–64 (S.D.N.Y.1966) (alleged violations of Sherman Act and Clayton Act in same count); *Wagner v. World Wide Autos. Corp.,* 201 F.Supp. 22, 23 (W.D.N.Y.1961) (violations of federal and state law in same count proper when arise out of same set of facts); *National Cold Storage Co. v. Port of N.Y. Auth.,* 24 F.R.D. 404, 405–06 (S.D.N.Y.1959) (two statutes alleged to have been violated in same count); *United States v. American Linen Supply Co.,* 141 F.Supp. 105, 108 (N.D.Ill.1956) (violations of Sherman Act and Clayton Act are properly combined into single count when they arise out of the same facts). That practice is proper under Rule 10(b), but that is not the situation with which the court is confronted in this case. Plaintiff's reliance on Rule 10(b) would be appropriate if, for example, in Count I of her complaint, she alleged sexual harassment under Title VII and the ICRA. But, by way of incorporation, she invoked her rights solely under Title VII, and Rule 10(b) is of no assistance to her post-trial attempt to argue that her complaint pleads claims under Title VII and the ICRA.

In short, plaintiff's Rule 8 argument fails because, as the master of her complaint, she chose to rely on Title VII, and the court will not infer any other statutory basis for her complaint. However, the court's analysis on this motion to reconsider does not end with consideration of Baker's Rule 8 argument because she also argued that the court improperly denied her Motion to Amend Complaint. The court turns now to that argument.

### D. Federal Rule of Civil Procedure 15(b)

■ In its March 17, 2003 Order, this court stated,

> Under these circumstances in which the court finds that the plaintiff moved to amend in order to avoid the Title VII damages cap but did not intend to bring the state-law claims until the large verdict was returned, the court opines that Rule 15(b) does not impart the court with authority to grant the plaintiff's amendment. However, because the standards for liability in this case are identical under the ICRA and Title VII and, therefore, amendment would not result in any prejudice to the defendant, the court would grant the plaintiff's motion if the court had discretion to do so.

[Order, Doc. No. 176, at 80 n. 19]. The court's decision was based on Baker's lack of intent to try her claims under the ICRA. Upon further consideration, however, the court now believes that this lack of intent does not preclude Baker from a post-trial amendment, so long as the defendant was not prejudiced and the added claims were in fact proven at trial. The court's authority to grant amendment is drawn not only from Rule 15(b), but also from Rule 54(c) and the spirit of the Federal Rules in general.

Rule 15(b) provides in pertinent part that,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings ... may be made upon motion of any party, at any time, even after judgment....

FED. R. CIV. P. 15(b).

Rule 1 of the Federal Rules of Civil Procedure sets the liberal backdrop

against which courts are directed to interpret the Rules: "They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." FED. R. CIV. P. 1. Rules 8, 15(b), and 54(c) also embody this liberal spirit. Wright, Miller, and Kane state, "To some degree, the functioning of all the procedures in the federal rules for broad joinder of parties and claims, discovery, free amendment, and summary judgment are intertwined inextricably with the pleading philosophy embodied in Rule 8." 5 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1202, at 68 (1990).

 "The federal courts have generally and consistently recognized that, as a general rule, amendments under Rule 15 should be allowed with liberality." *Standard Title Insurance Co. v. Roberts*, 349 F.2d 613, 622 (8th Cir.1965). The intent of Rule 15(b) is "to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir.1982). Courts should construe Rule 15(b) liberally and allow an amendment whenever doing so will effectuate the purpose of the rule. 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1491. The seminal Eighth Circuit case on Rule 15(b) motions to conform to evidence is *Gallon v. Lloyd–Thomas Co.*, 264 F.2d 821 (8th Cir.1959). The *Gallon* court provides a concise summary of the law on this point:

While, in general, Rule 15 of the Federal Rules of Civil Procedure contemplates that amendments to pleadings should be allowed with liberality where necessary to bring about furtherance of justice and where the adverse party will not be prejudiced, it is a settled rule of practice that the trial court is vested with sound discretion in granting or refusing an amendment to pleadings, and the extent of this Court's review is limited to the question of abuse of this discretion.

*Id.* at 823 (citations omitted). More recently, in *Gamma–10 Plastics, Inc. v. American President Lines, Ltd.*, 32 F.3d 1244 (8th Cir.1994), the Court of Appeals for the Eighth Circuit stated the relevant standards for a Rule 15(b) amendment after judgment:

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore, an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, even though there is evidence in the record—introduced as relevant to some other issue—which would support the amendment."

*Id.* at 825 n. 3 (citation omitted). With respect to post-trial motions under Rule 15(b), the court plainly stated that "[a]n amended complaint that 'merely amplifies some of the allegations that have been proven' should be allowed." *Id.* (quoting *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981)).[2] This is so because the purpose of the Rule is to "promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel...." 6 CHARLES A.

---

2. The Supreme Court in *Memphis Community School District v. Stachura*, 477 U.S. 299, 304 n. 5, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) expressed specific disapproval of *Herrera* as being one of several cases in which the circuit courts of appeal have acted improperly in upholding damage awards based upon the abstract value of the substantive constitutional rights in question. *Herrera* is no longer good law on this point. *Harris v. City of Pagedale*, 821 F.2d 499, 505 n. 8 (8th Cir. 1987).

WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1491, at 454 (1971); *see Wallin v. Fuller*, 476 F.2d 1204, 1210 (5th Cir.1973).

In this case, amendment would not inject any new issues or theories into the case. The issues raised in Baker's proposed ICRA claims are identical to those tried under Title VII: retaliation and hostile-work-environment. Moreover, the standards of liability for the ICRA claims are identical to the Title VII claims she proved at trial. *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n. 3 (8th Cir.1999) (discrimination claims under ICRA are analyzed in same manner as their federal law counterparts); *Moschetti v. Chicago, Cent. & Pac. R. Co.*, 119 F.3d 707, 709 n. 2 (8th Cir.1997) (analysis of retaliation claims is the same under Title VII and ICRA); *Henderson v. Heartland Press, Inc.*, 65 F.Supp.2d 991, 999 (N.D.Iowa 1999) (prima facie case for actionable hostile work environment the same under both ICRA and Title VII), *aff'd*, 230 F.3d 1363, 2000 WL 1120590 (8th Cir.2000); *Schwarz v. Northwest Iowa Cmty. Coll.*, 881 F.Supp. 1323, 1338 (N.D.Iowa 1995) (test for constructive discharge); *Naylor v. Georgia–Pacific Corp.*, 875 F.Supp. 564, 573 (N.D.Iowa 1995).

Because the standards for liability are identical, amendment in this novel situation would not deprive John Morrell of any fair opportunity to present evidence because it defended against those same claims at trial—the fact it defended against the claims under Title VII and not the ICRA is a mere formality that has no bearing on the substance of John Morrell's defense in this case or on Baker's theories of recovery.

■ A court's primary concern on Rule 15(b) motions is possible prejudice to the defendant. *E.g., Byrd v. Brandeburg*, 922 F.Supp. 60, 65 (N.D.Ohio 1996) (citation omitted). In *Byrd v. Brandeburg*, 922 F.Supp. 60 (N.D.Ohio 1996), the plaintiffs brought a civil rights action against a Caucasian minor who threw a Molotov cocktail onto the porch of their home. *Id.* at 62. The plaintiffs also named the minor defendant's parents as defendants in the case and sought to hold them liable under an Ohio statute that imposed liability on custodial parents. *Id.* at 65. The statutory provision they cited in their complaint to establish parental liability was different than the provision they cited in their summary judgment motion. *Id.* The provision in the complaint established liability for a minor's vandalism, while the provision on summary judgment imposed liability when a minor "willfully damages" the property of another. *Id.* The *Byrd* court construed the plaintiffs' citation in their summary judgment motion as a motion to amend under Rule 15(b). *Id.* The court allowed the amendment, reasoning, "where the new claim that is added was subsumed in the context of the case and would require no new discovery, where the defendant had a fair opportunity to litigate the issue added, and where the defendant did not object to the insertion of the issue into the proceedings," amendment is proper. *Id.* (internal citations omitted).

■ Baker's case is strikingly similar to the *Byrd* case because her ICRA claims do not present any new issues but merely a separate statutory provision that provides for recovery under the same set of facts and for the same conduct. For the same reasons the court articulated in its March 17, 2003 Order, John Morrell would not be prejudiced by amendment in this case. Here, of course, the defendant does object to the amendment. Amendment in this case potentially has a significant impact on the amount of damages Baker may be able to receive because the ICRA does not impose a cap on damages. Neverthe-

less, because of the identical nature of the Title VII and ICRA retaliation and hostile-work-environment claims and because John Morrell would suffer no prejudice by amendment, especially in light of the fact John Morrell labored under the false belief that Title VII's damages cap provision did not apply to punitive damages, the court grants Baker's Motion to Amend Complaint, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure.[3]

### E. Federal Rule of Civil Procedure 54(c)

In addition, Rule 54(c) also authorizes Baker to recover under Iowa's civil rights statute in this case. Rule 54(c) provides that, except in cases of judgment by default, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

### 1. Mandatory nature and purpose of Rule 54(c)

"This provision has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 803 (4th Cir.1971); *accord Charles Schmitt & Co. v. Barrett*, 670 F.2d 802 (8th Cir.1982) ("While Barrett now claims that he did not consent to try that issue, Rule 54(c) nonetheless provides that the trial court may grant the relief to which the prevailing party is entitled, re-

gardless of whether such relief was prayed for in the complaint."); *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 25 (4th Cir.1963) ("[A] party's misconception of the legal theory of his case does not work a forfeiture of his legal rights."). Rule 54(c) "requires courts to award the relief to which the prevailing party is entitled, even if that party did not request the relief or relied on the wrong statute." *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 112 (7th Cir.1990); *accord Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (7th Cir.1987) ("Rule 54(c) was designed to divorce the decision what relief to award from the pleadings and arguments of counsel; the court is to determine, and award, the right relief in each case even if the complaint is silent on the question."). The theory behind Rule 54(c) is that "the dimensions of a lawsuit are measured by what is pleaded and proven." *Thomas v. Pick Hotels Corp.*, 224 F.2d 664, 666 (10th Cir.1955); *see Minyard Enterps., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 386 (4th Cir.1999) (same). Rule 54(c), and the federal rules in general, "evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense on the merits." 5 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1219, at 192–94 (1990) (footnotes omitted).

---

**3.** The court need not loiter long over John Morrell's argument that any claims under the ICRA would be time-barred. Rule 15(c) provides that amendments relate back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P.

15(c)(2); *see also Travelers Insurance Co. v. 633 Third Assocs.*, 14 F.3d 114, 126 (2d Cir. 1994) (a claim on a different legal theory would relate back to the original complaint). Baker's ICRA claims arise out of the identical set of facts as her Title VII claims and, moreover, allege the same theories of discrimination. Her ICRA claims, therefore, are timely.

█ Unlike Rule .15, Rule 54(c) contains no express requirements of consent or lack of prejudice. Nevertheless, it "allows alternative relief only where *all* factual conclusions necessary for the relief sought have been found by the trier of fact." *Gilbane Bldg. Co. v. Federal Reserve Bank*, 80 F.3d 895, 904 (4th Cir.1996) (citing *Cioffe v. Morris*, 676 F.2d 539, 541 (11th Cir.1982) ("Rule 54(c) creates no entitlement to relief based on issues not squarely presented and litigated at trial.")). Still, Rule 54(c) is not without its limits. The Court of Appeals for the Fourth Circuit has noted that "[c]ase law has carved out an exception [to the compulsory nature of Rule 54(c) ] where alternative relief would be unfairly prejudicial." *Gilbane*, 80 F.3d at 901 n. 2 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)); *accord Dunkin' Donuts of Am., Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1575 (11th Cir.1992) (Clark, J., concurring in part and dissenting in part) ("The only relevant limitation to this rule arises when a failure to ask for a particular relief substantially prejudices the opposing party."); *Stewart v. Furton*, 774 F.2d 706, 710 (6th Cir.1985) ("The mandate of Rule 54(c) has been deemed applicable only when there is no prejudice to the defendant as a result of the plaintiff's failure to plead certain relief.") (citing *Albemarle Paper Co.*, 422 U.S. 405 at 424, 95 S.Ct. 2362, 45 L.Ed.2d 280); *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1242 (5th Cir.1984) ("[A] party's failure to seek a form of permissible relief in his pleadings may operate to the prejudice of the opposing party when that relief is finally sought at a much later stage of the proceedings. Denial of relief is then also appropriate.") (citing *International Harvester Credit Corp. v. East Coast Truck*, 547 F.2d 888, 891 (5th Cir.1977); *Sapp v. Renfroe*, 511 F.2d 172, 176 n. 3 (5th Cir.1975)). The Fourth Circuit Court

of Appeals has held that one such unfairly prejudicial situation occurs, barring Rule 54(c) relief, when "a substantial increase in the defendant's potential ultimate liability" would result. *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 (4th Cir.1983); *see Goodman v. Poland*, 395 F.Supp. 660, 685 (D.Md.1975) (substantial increase in defendant's potential ultimate liability can constitute specific prejudice barring additional relief under Rule 54(c)).

### 2. *"Unfairly prejudicial" exception*

To determine whether relief is appropriate under Rule 54(c), the court must ask two questions: (1) Did Baker plead and prove all allegations supporting her retaliation and harassment claims under the ICRA?; and, if so, (2) did Baker's failure to expressly demand relief in her complaint pursuant to the ICRA unfairly prejudice John Morrell? *See Minyard Enterprises, Inc. v. Southeastern Chemical & Solvent Co.*, 184 F.3d 373, 386 (4th Cir. 1999) (posing proof and prejudice questions to determine if Rule 54(c) relief was available).

### a. Did Baker prove her ICRA claims?

Because standards for liability are identical under Title VII and under the Iowa Civil Rights Act ("ICRA") in this case, *Madison v. IBP, Inc.*, 257 F.3d 780 (8th Cir.2001), *cert. granted, judgment vacated on other grounds*, 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002), there is no question that Baker proved all the essential elements of her state-law harassment and retaliation claims because the jury found in her favor and against John Morrell on these claims, though brought under Title VII. Moreover, John Morrell had notice of the facts upon which Baker sought relief, which satisfies the lenient requirements of the liberal standards of notice

pleading. While her complaint did not expressly plead the ICRA, the factual allegations contained in her complaint served to put John Morrell on notice of the parallel state-law claims for the same reason stated above concerning Baker's proof of the essential elements of her ICRA claims—the same factual underpinnings support both the federal and state-law claims because the standards for liability are identical. The court, therefore, answers the first question in the affirmative.

### b. Does the ICRA's absence of a damages cap unfairly prejudice John Morrell?

The answer to the second question is less straight-forward because of the amount of potential damages available under Title VII and the ICRA. The defendant was clearly not prejudiced in its defense of any ICRA claims because of the fact that liability standards mirror those of Title VII. Pertinent to this case, the main distinction between Title VII and the ICRA is the damages cap provision contained in Title VII. For an employer of John Morrell's size, Title VII limits the damages to $300,000.00, and this cap embraces both compensatory and punitive damages combined. *See* 42 U.S.C. § 1981a(b)(3). The ICRA, on the other hand, allows no punitive damages, *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 382–84 (Iowa 1986), but does not place a cap on the amount of compensatory damages. Moreover, Iowa law provides for pre-judgment interest on backpay and emotional distress awards, *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 896 (Iowa 1990),

whereas federal law does not.[4] The fighting issue in this case, therefore, is whether the "unfair prejudice" exception to the mandate of Rule 54(c) applies because of the difference in the amount of recoverable damages under Title VII and the ICRA.

In *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712 (4th Cir.1983), the Court of Appeals for the Fourth Circuit held that "a substantial increase in the defendant's potential ultimate liability can constitute specific prejudice barring additional relief under Rule 54(c)." *Id.* at 716–17 (citing *Goodman v. Poland*, 395 F.Supp. 660, 685 (D.Md.1975)). In that case, the plaintiff tried its case against the defendant as a fraud and breach-of-express-warranty case. *Id.* at 714. The plaintiff prevailed at trial, and the jury awarded $31,000.00 in actual damages and $15,000.00 in punitive damages. *Id.* After the verdict was returned, the plaintiff submitted a claim including attorney's fees and a trebling of the actual damages pursuant to a North Carolina statute that made deceptive trade practices illegal and entitled a prevailing plaintiff in a private enforcement action to have the damages assessed by the jury trebled. *Id.* at 715.

This post-verdict claim was the plaintiff's first mention of or reference to the North Carolina statute and its trebled damages provision made throughout the entirety of the litigation. *Id.* The district court denied the plaintiff's request to have the actual damages trebled, and the plaintiff appealed, arguing that it made out a clear case of violation of the North Carolina statute and that, in accordance with

---

4. Baker did not request an award of pre-judgment interest until her post-verdict Motion to Amend Judgment. However, her failure to do so is not dispositive. The court in *Williamson v. Handy Button Mach. Co.*, 817

F.2d 1290, 1298 (7th Cir.1987), affirmed the district court's allowance of pre-judgment interest, which the district court awarded pursuant to Rule 54(c).

Rule 54(c), it was entitled to treble actual damages and to attorney's fees. *Id.*

The *Atlantic Purchasers* court agreed with the plaintiff's assertion that, in proving its fraud claim against the defendant, it had also established a violation of the North Carolina statute. *Id.* at 715–16. Similar to Title VII and the ICRA in this case, proof of one was proof of the other because the elements of a fraud claim in *Atlantic Purchasers* satisfied the elements of a statutory violation. The court, however, did not allow the North Carolina statutory claim because of the unusual nature of trebled damages and the prejudice to the defendant caused by the plaintiff's failure to notify the defendant of the possibility of such unusual relief. *See id.* at 717. This lack of notice deprived the defendant and its counsel of "the opportunity to make a 'realistic appraisal of the case, so that [their] settlement and litigation strategy [could be] based on knowledge and not speculation.'" *Id.* (citing FED. R. CIV. P. 26(b)(2), Advisory Committee Notes to 1970 amendments).

Moreover, the court explained that the defendant was not prejudiced by the mere lack of specific words in the plaintiff's complaint denoting the North Carolina statute. *Id.* This was so because the defendant was able to defend itself against the plaintiff's fraud claim, which also established a violation of the statute. Nevertheless, prejudice to the defendant did arise out of the denial of " 'illumination ... as to the substantive theory under which [the plaintiff] was proceeding.'" *Id.* (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978)). In *Atlantic Purchasers*, the plaintiff's request for trebled actual damages was truly a change in its substantive theory of recovery because it would not be entitled to both compensatory damages on a common law contract theory and a statutory treble

damages award. *Id.* at 716 n. 2. Furthermore, the court doubted that North Carolina courts would uphold a punitive damages award on the plaintiff's fraud claim along with trebled damages for the statutory violation. *Id.* Thus, the plaintiff in *Atlantic Purchasers* was never entitled to all the remedies available to it as a matter of law. It had to make a choice between its common law remedies and the statutory violation theory. *See id.* at 717. The court characterized this choice as "mak[ing] its legal bed," and by refusing Rule 54(c) relief, the district court did no more than "requir[e] that [the plaintiff] lie in it." *Id.*

Baker's case is easily distinguishable. First, the ICRA does not provide for any "unusual remedies." The remedies available under the ICRA are as normal as blueberry pie. Ordinarily, prevailing plaintiffs are entitled to damages that compensate them for the injuries they seek to redress. *Id.* (citing 5 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1310 (1969)). The North Carolina statute at issue in *Atlantic Purchasers* created an unusual remedy that went beyond compensating the plaintiff and was intended to punish the defendant for its conduct. *See id.* This punitive function of treble damages makes them unusual. *See id.* Here, the ICRA does not create any unusual remedies but instead provides only for compensatory and emotional distress damages.

Second, the compensatory damages that are available to prevailing ICRA plaintiffs are identical to those available to prevailing Title VII plaintiffs. Thus, unlike the North Carolina statute in *Atlantic Purchasers*, the ICRA and Title VII allow for the same kind of compensatory relief, none of which is unusual. Because the type of compensatory relief available under Title VII and the ICRA are the same, civil

rights plaintiffs are not required to choose one theory over the other. The remedies are not inconsistent but rather complement each other.

▮ Unlike the North Carolina statute, civil rights plaintiffs are not required to choose between enforcing their rights under either federal *or* state law. Instead, in enacting Title VII, Congress expressly intended that civil rights plaintiffs remain free to enforce their rights under state law because Title VII establishes a floor, not a ceiling, and states are free to grant more protection than federal law provides. *See* 42 U.S.C. § 2000e–7 (nothing in Title VII "shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State."); *Martini v. Federal Nat'l Mortgage Ass'n,* 178 F.3d 1336, 1349–50 (D.C.Cir.1999) (reasoning that, if courts were not allowed "to treat damages under federal and local law as fungible where the standards of liability are the same, [it] would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII."), *quoted in Madison,* 257 F.3d at 801.

Third, even if the court were to assume that relief under the ICRA, with its lack of a damages cap provision in mind, would otherwise work a substantive change in the plaintiff's theory of recovery because of the difference in the ultimate potential liability under the two statutes, no prejudice is present in this case. As previously mentioned, the standards of liability under the ICRA and Title VII are identical, and the statutes only part ways on the amount of recoverable damages. Under Title VII, damages against an employer of John Morrell's size are limited to $300,000.00, and this figure encompasses the combined total of punitive and compensatory damages. *See* 42 U.S.C. § 1981a(b)(3). However, up until the post-trial motions phase of litigation, counsel for John Morrell labored under the erroneous belief that Title VII's damages limitation provision did not apply to punitive damages awards. [Motions *in Limine* Tr. at 13]. Moreover, at no time before or during trial did Baker request less than the damages cap provision—throughout the pendency of this litigation, she demanded more damages than would have been recoverable under Title VII. Thus, neither the defendant's nor its counsel's assessment of strategy or of settlement decisions was clouded by reliance on the $300,00.00 damages cap provision.

What is more, subsequent to the *Atlantic Purchasers* decision, the Court of Appeals for the Fourth Circuit affirmed a district court's grant of an amendment adding this same North Carolina statute pursuant to Rule 54(c). *See Gilbane Bldg. Co. v. Federal Reserve Bank,* 80 F.3d 895 (4th Cir.1996). The *Gilbane* court distinguished the facts of the case from *Atlantic Purchasers* on the ground that, in *Gilbane,* the plaintiffs moved to add the state-law claim for trebled damages at the beginning of the non-jury trial. *Id.* at 901–02. Accordingly, the defendants were not unfairly prejudiced, and Rule 54(c) entitled the plaintiffs to the trebled damages available under the North Carolina statute. *Id.* at 902. While Baker did not move to add her ICRA claims until after the jury rendered its verdict, for the reasons stated above, John Morrell suffers no prejudice from adding her ICRA claims, and, therefore, she is entitled to recover under the ICRA because she proved the ICRA claims at trial.

### 3. Are the ICRA claims a separate "theory" or "issue"?

The defendant argues that Baker is precluded from bringing her claims under the

ICRA and that neither Rule 15(b) nor Rule 54(c) can salvage her claim because "[i]t is settled law that a plaintiff cannot bring his action and try his case on one theory and recover on another." *Armstrong Cork Co. v. Lyons*, 366 F.2d 206, 209 (8th Cir.1966) (footnote); *see also Old Republic Insurance Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1080 (7th Cir.1998) ("Rule 54(c) does not allow the district court to award relief based on a theory that was not properly raised at trial....") (citing *In re Rivinius, Inc.*, 977 F.2d 1171, 1177 (7th Cir.1992)). However, the cases cited by the defendant are inapposite. For instance, in *Old Republic Insurance Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077 (7th Cir.1998), Old Republic Insurance Company sued Employers Reinsurance Corporation for a declaratory judgment to determine whether portions of Old Republic's letter of intent or whether Employers Reinsurance Corporation facultative certificates formed the contract that bound their reinsurance agreement, and Old Republic also sued for breach of that contract. *Id.* at 1078. The district court held that the facultative certificates formed the contract. *Id.* On appeal, Old Republic challenged the district court's refusal to award it monetary damages and its order compelling Old Republic to comply with the facultative certificates. *Id.*

In order to be entitled to money damages on the court's finding that the facultative certificates formed the contract, it was necessary to determine, based on the facts alleged in the complaint, whether Old Republic had asserted a breach of contract claim under two theories: one based on the letter of intent and another on the facultative certificates. *Id.* at 1080. The court construed the complaint liberally but found that Old Republic had not brought a breach of contract claim under both the letter of intent and the facultative certificates. *Id.* Instead, "Old Republic placed all of its eggs in the letter of intent basket." *Id.* at 1081. The court reasoned,

> Rule 54(c) limits the significance of Rule 8(a)(3)'s requirement of a demand for judgment once the litigation has begun by allowing the district court to grant the relief to which the prevailing party is entitled. *See* 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2664 (2d ed.1983). It does not permit a court to impose liability where none has been established. *See Southern Constructors Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 610 (5th Cir.1993); *Flannery v. Carroll*, 676 F.2d 126, 132 (5th Cir.1982). Because Old Republic did not present a breach of contract claim based on the facultative certificates, the district court did not abuse its discretion by refusing to award damages.

*Id.*

This is not a case like, for example, *United States v. Munoz*, 746 F.2d 1389 (9th Cir.1984). In that case, the court rejected the appellants' contention that the district court should have granted them Rule 54(c) relief in tort *sua sponte* even though they pleaded only a contract cause of action. *Id.* at 1390. In support of their contention, the appellants relied on a court's duty to grant Rule 54(c) relief. *Id.* The appellate court emphasized that a court did not have a duty to grant Rule 54(c) relief when the substantive ground for relief is not pleaded. *Id.*[5]; *see also*

---

**5.** It should be noted that this language is purely dicta because the *Munoz* court refused to entertain the appellants' argument because it was not presented to the district court.

*Munoz*, 746 F.2d at 1390. In the Ninth Circuit, the district court will not be reversed on a contention not presented to it, "absent exceptional circumstances, significant questions

*Armstrong Cork Co. v. Lyons,* 366 F.2d 206, 209 n. 3 (8th Cir.1966) (" 'Plaintiff cannot try his case on one theory and then, after finding himself unable to prove it, shift to another.' ") (quoting 71 C.J.S. *Pleading* § 92 (1951)). As previously stated, Baker does not seek to change her theories of recovery. Moreover, this is not a case where Baker seeks to assert her claims under a different statute because she cannot prove her case under the pleaded statute because, here, both Title VII and the ICRA impose liability under the facts Baker proved at trial. Since the earliest days of this litigation, she has sought to hold John Morrell liable for retaliation and for maintaining a sexually hostile work environment, and her ICRA claims do not change those theories.

Similarly, the Court of Appeals for the First Circuit held that Rule 54(c) did not authorize the district court to recast the plaintiff's complaint on its own volition and without notice where the court's decision rests on an unpleaded and untried theory. In *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168 (1st Cir.1995), the plaintiff brought a sexually hostile work environment claim under Title VII and under a pendent Puerto Rico statute, known as Law 100. *Id.* at 1169. The plaintiff's supervisor had subjected the plaintiff in *Rodriguez* to multiple incidents of sexual harassment that included nonconsensual physical contacts. *Id.* at 1170. The case was tried to the bench, and the district court found that the plaintiff's work environment was "hostile" within the meaning of Title VII but found that the defendant employer could not be held liable because it did not have notice of the supervisor's conduct. *Id.*

Instead of entering judgment for the defendant, the district court, on its own initiative, decided the case in favor of the plaintiff by recourse to an unpleaded Puerto Rico statute, Law 17, which holds employers strictly liable for damages arising out of harassment in the workplace. *Id.* at 1171. The court did not give notice to either party of its intent to depart from the pleadings, and the employer appealed. *Id.*

The *Rodriguez* court determined that the district court's action in injecting a Law 17 claim implicated three rules of civil procedure, Rules 8(a), 15(b), and 54(c), and the court addressed the applicability of each rule. *Id.* First, with respect to Rule 8(a), the *Rodriguez* court rejected its application for a similar reason that this court found that Rule 8 does not give rise to an ICRA claim in this case:

> Her complaint did not delineate such a claim when filed; she did not add one by formal amendment; she did not mention the statute in her pretrial filings; and she did not explicitly refer to it at any point during the trial. In short, this is not a case in which a properly pleaded legal theory has been obscured by the parties' concentration on other theories, but, rather, a case in which a particular legal theory was never so much as a gleam in the pleader's eye.

*Id.*

Concerning an amendment under Rule 15(b), the court held that the unpleaded claim was not injected into the litigation by way of a "constructive amendment" when neither the plaintiff nor the court made reference to the new claim because the pleaded claims and the unpleaded claim were so similar that "the likelihood of differential discernment on the defendant's part [was] relatively low." [6] *Id.* at 1173.

---

of general impact, or where injustice might otherwise result." *Id.* (citations omitted).

**6.** Unlike the plaintiff in *Rodriguez,* Baker herself moved for amendment under Rule 15(b).

Recognizing that "the root purpose of [Rule 15(b)] is to combat 'the tyranny of formalism,'" the court held that the rule could not "be so liberally construed as to empty Rule 8(a) of its meaning." *Id.* (quoting *Rosden v. Leuthold,* 274 F.2d 747, 750 (D.C.Cir.1960)).

Turning to Rule 54(c), the court concluded that Rule 54(c) relief was unavailable because the rule's "safety net [could not] be stretched so widely as to grant a plaintiff relief on an unpleaded theory of which the defendant had no notice." *Id.* That was so because " 'Rule 54(c) creates no right to relief premised on issues not presented to, and litigated before, the trier.'" *Id.* (quoting *Dopp v. HTP Corp.,* 947 F.2d 506, 518 (1st Cir.1991)) (citations omitted).

In order for the court to interpret the *Rodriguez* case in the manner urged by John Morrell, the court would have to construe the *Rodriguez* court's use of the terms "issue" and "theory" to encompass recovery under a separate statute, even though the claims—retaliation and hostile work environment—are identical. This the court cannot do.

According to Professor Moore, the purpose of Rule 54(c) is to "ensure[ ] that substance will prevail over form." 10 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE 3D ¶ 54.72(1)(a). In *Rodriguez,* the district court injected an entirely new theory of recovery into the case—strict liability. *See Rodriguez,* 57 F.3d at 1170–71. Here, Baker's theory of recovery remains unchanged. The only difference is that she seeks to assert her theories of recovery (retaliation and hostile work environment) under the ICRA as well as under Title VII. As previously discussed, John Morrell is not prejudiced by these added claims, and its defense of the action is not impacted. The mere fact that Law 17 imposed liability where Title VII did not distinguishes Baker's case from *Rodriguez.* In *Rodriguez,* the law's application of strict liability implicated an entirely new theory of recovery that directly clashed with Title VII's standards of liability, which require notice: By definition, Law 17 imposed liability even when the employer was unaware of the supervisor's harassing conduct. *Id.* at 1171. Where the elements of the claims are identical and adding the parallel state-law claims does not pose any prejudice to the defendant, refusing to award Baker damages under the ICRA would contravene the purpose of the federal rules and elevate form over substance. In short, unlike *Rodriguez,* the ICRA does not introduce any new "issues" or "theories," and, therefore, Rule 54(c) relief in the form of recovery under the ICRA is appropriate.

As Baker points out, Eighth Circuit Court of Appeals case law supports this distinction between a claim arising out of the same set of facts, irrespective of the particular statute that supports a cause of action, and new "issues" and "theories." For example, in *Clients' Council v. Pierce,* 778 F.2d 518 (8th Cir.1985), *opinion withdrawn and judgment vacated,* 785 F.2d 1387 (8th Cir.1986),[7] the court reversed the

---

Moreover, the standards for liability on the ICRA claims she wishes to add are identical to the Title VII claims proved at trial. This was not the case with respect to Law 17 and Title VII because Law 17 imposed liability in *Rodriguez* where Title VII did not. *See Rodriguez,* 57 F.3d at 1170–71.

7. The opinion in *Client's Council* was withdrawn and the judgment vacated on the parties' joint motion to vacate as moot the court's opinion and judgment. *Clients' Council v. Pierce,* 785 F.2d 1387 (8th Cir.1986). The appellant voluntarily dismissed the appeal. *Id.* Thus, it appears that the judgment was vacated because of settlement and, therefore, that the opinion serves as a useful guide and is not "bad law" despite the fact the opinion was withdrawn and the judgment vacated.

district court's denial of attorney's fees under 28 U.S.C. § 2412(b) and 42 U.S.C. § 1988. The plaintiffs in *Clients' Council* brought suit against various Department of Housing and Urban Development officials, alleging that the officials violated the Fifth Amendment to the United States Constitution and Title VII by discriminating against African American residents who were eligible for public housing in Texarkana, Arkansas. *Id.* at 519. The plaintiffs prevailed and subsequently sought attorney's fees, even though the fee shifting statutes did not specify the Fifth Amendment as a basis for an award of attorney's fees. *Id.* The district court denied the request, and, on appeal, the plaintiffs argued that, even though relief was granted under the Fifth Amendment, the same relief could also have been awarded under two statutes that were specifically identified in the fee-shifting statutes, namely sections 1981 and 1982. *Id.* at 520.

The Court of Appeals held that attorney's fees should have been awarded because the plaintiffs would have been able to prevail under sections 1981 and 1982, even though they did not pursue these causes of action, and because the defendants were not mislead in their defense of the action. *Id.* The court distinguished the case from a previous en banc decision, *Premachandra v. Mitts,* 753 F.2d 635 (8th Cir.1985) (en banc), which held that a Fifth Amendment procedural due process claim did not support attorney's fees under section 1988 even though the plaintiff could have brought his claim under a statute that would have allowed fee-shifting, section 1983. *Clients' Council,* 778 F.2d at 519–20. In that case, the plaintiff's proof on his procedural due process claim was not identical to what he would have had to prove on a section 1983 claim. *Id.* at 520–21. The court stated,

> [T]his case is distinguishable from *Premachandra* because that case involved a claim that attorney's fees should be available against the government for a fifth amendment procedural due process claim which was at best similar to a section 1983 claim but which would have required a much different theory of proof to establish liability.... In our view, it would be unjust and inconsistent with the modern rules of pleading to deny fees to a plaintiff who originally pleaded but ultimately failed to pursue a statutory fee claim, but prevailed on an identical constitutional claim.

*Id.* at 521 (citing *Kirchberg v. Feenstra,* 708 F.2d 991, 999–1001 (5th Cir.1983)).

Here, Baker, of course, did not originally plead her claims under the ICRA, whereas the plaintiffs in *Clients' Council* had originally pleaded sections 1981 and 1982 but deleted these claims in their amended complaint. However, it is clear that the *Clients' Council* court focused primarily on the identical nature of the claims that the plaintiffs did pursue and sections 1981 and 1982 and on the injustice of disallowing fees when the elements and proof of the separate claims mirrored that of the claim on which the plaintiffs ultimately prevailed. *See id.* Thus, despite the fact the plaintiffs prevailed on a claim that was not specified in the fee-shifting statutes, the facts proved would have proved violations of sections 1981 and 1982 and, therefore, attorneys' fees should have been awarded. *See id.*

While there are no "on point" cases on this issue, Baker's case is most similar to *Travis v. Gary Community Mental Health Center,* 921 F.2d 108 (7th Cir.1990). In *Travis,* the plaintiff brought an action under the Fair Labor Standards Act and the Klu Klux Klan Act, alleging retaliation. *Id.* at 109. At trial, the jury awarded the plaintiff compensatory and punitive damages and attorney's fees. *Id.* The defen-

dant appealed. *Id.* On appeal, the plaintiff relied on the Klu Klux Klan Act in support of her claim. *Id.* That Act, unlike the provision of the Fair Labor Standards Act that forbids retaliation, requires proof of a conspiracy. *Id.* At oral argument, the plaintiff's counsel candidly conceded that he relied on the Klu Klux Klan Act because he believed that Supreme Court precedent limited the availability of compensatory and punitive damages under the Fair Labor Standards Act. *Id.* at 111.

The *Travis* court held that the plaintiff failed to prove a conspiracy within the meaning of the Klu Klux Klan Act, but despite the plaintiff's sole reliance on that act, the Fair Labor Standards Act provided the relief he sought because he proved his former employer violated the provisions of that act when it retaliated against him. *Id.* The same is true in Baker's case: she stood on Title VII, but by proving John Morrell violated Title VII, she proved that John Morrell discriminated against her in violation of the ICRA. Consequently, she should be allowed to recover under both state and federal law for the discrimination and harassment she endured as an employee at John Morrell, regardless of the particular statutory provision she pleaded, because of the identical nature of her ICRA and Title VII retaliation and sexual harassment claims in this case.

This case, in sum, illustrates the necessity of avoiding formalistic interpretations of the federal rules when such interpretations would work an injustice. More importantly, this case demonstrates that claims which arise out of the same set of facts are not to be harshly segregated when their only difference is that they are violations of discrete statutes. A claim under a separate yet parallel statute, therefore, does not inject new theories or issues into a case when the standards for liability are

the same. *See id.* (distinguishing *Premachandra* on ground Premachandra's due process claim was only "similar," not identical, to a section 1983 claim); *accord La Raza Unida v. Volpe,* 440 F.Supp. 904, 907–08 (N.D.Cal.1977) (allowing recovery of attorney's fees under 42 U.S.C. § 1988 on ground that plaintiffs' lawsuit proved substance of section 1983 claim, which is listed in section 1988, even though they did not plead a section 1983 cause of action); *cf. Engelhardt v. Bell & Howell Co.,* 327 F.2d 30, 32–33 (8th Cir.1964) (holding that when "the basic wrongful acts pleaded in all actions appear to be the same," state and federal law claims constitute the same cause of action for res judicata purposes).

The court finds that, even though a post-verdict amendment under Rule 15(b) allows Baker to add her ICRA claims and is appropriate under the facts of this case, Rule 54(c) also authorizes Baker to recover under the ICRA. That the ICRA does not impose a damages limitation does not work a substantive change in Baker's claims, and John Morrell was not prejudiced in its defense of those claims. *See In re Dobrayel,* 287 B.R. 3, 19, 20 n. 14 (Bkrtcy. S.D.N.Y.2002) (analyzing *sua sponte* non-dischargeability claim under unpleaded statutory provision without a formal amendment because " 'all of the material facts' necessary for non-dischargeability under [the unpleaded provision] have been pleaded in the complaint and proven at trial.") (quoting *In re Soliz,* 201 B.R. 363, 370 (Bankr.S.D.N.Y.1996) ("Since all of the material facts which form the basis for non-dischargeability are pleaded in the complaint, an invocation of a different statute than that mentioned in the complaint does not constitute an amendment of the complaint.")) (citing *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("[I]t is appropriate for [the Court] to . . . decide the legal issues without first insisting that . . . a formal amend-

ment be filed; this is because we regard the record as plainly identifying the petitioners' claim for damages on [a different legal theory]"); *Levy v. Alliance Capital Mgmt. L.P.*, 189 F.3d 461, 1999 WL 642920, at *2 (2d Cir.1999) ("[C]ourts should look to the facts pleaded rather than to the particular legal theory presented"); *Bowers v. Hardwick*, 478 U.S. 186, 201, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (courts are "under a duty to examine the complaint to determine if the allegations provide for relief under any possible theory:"); *Phillips v. Grendahl*, 312 F.3d 357, 364 (8th Cir.2002) ("Phillips's failure to identify the correct statutory section does not limit us in construction of his complaint, so long as the complaint pleads facts that state a cause of action under the correct section.") (citation omitted); *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 n. 6 (2d Cir.1997) ("However mistaken the statutory basis ... of her complaint," plaintiff gave factual allegations that support false pretenses while she was proceeding under a different statutory basis and the court found that this made clear that her second amended complaint was "sufficient" to state a claim under a different statutory basis); *Underwriters Salvage Co. v. Davis & Shaw Furniture Co.*, 198 F.2d 450, 453 (10th Cir.1952) ("[I]t is duty of the court to consider issues raised by evidence received without objection even though no formal application is made to amend.")). That is so because the ICRA allows for the same relief, *i.e.*, compensatory damages, that is available under Title VII, and the standards for liability under the two statutes are identical in this case.

### III. DEFENDANT'S MOTION TO AMEND THE JUDGMENT

Having determined that Baker is entitled to recover under both state and federal law (pursuant to both Rule 15(b) and Rule 54(c)), the court turns next to the post-trial motions, the dispositions of which turned on the court's previous denial of Baker's Motion to Amend Complaint. Specifically, the court must consider whether allocation of Baker's claims to her added ICRA claims is appropriate, whether or not to award pre-judgment interest on her state-law awards, whether the evidence supports the entirety of the jury's compensatory damages award, whether the evidence supports punitive damages, and, if so, in what amount. However, before turning to John Morrell's substantive arguments touching on the sufficiency of the evidence to support Baker's awards, the court must first address whether Baker is entitled to allot a portion of her total jury award to her ICRA claims because, if the court were to determine that allocation is inappropriate, Title VII's damages cap provision would trump Baker's arguments that the evidence supports the jury's sizeable award.

### A. Allocation of Compensatory Damages to ICRA Claims

 In Baker's Motion to Amend Complaint, she requested that the court allocate all of the jury's compensatory damages award to her newly added ICRA claims, thus avoiding Title VII's damages cap on those awards. Because the court disallowed the amendment, the court did not consider allocating the award in its March 17, 2003 Order. With respect to the compensatory damages that Baker seeks to allocate to her state-law claims, the jury awarded Baker $872,784.97. The award was not tied to either federal or state law and was apportioned as follows:

- On her sexual harassment claim $250,000.00 for past emotional distress and $50,000.00 for future emotional distress;

- On her retaliation claim, $75,000.00 for past emotional distress and $10,000.00 for future emotional distress;
- On her constructive discharge claim, $150,000.00 for past emotional distress and $200,000.00 for future emotional distress;
- For the medical expenses on her sexual harassment claim, $14,470.24 for past medical expenses and $90,000.00 for future medical expenses; and
- In backpay, $33,314.73.

The sum total of the jury award in this case was $1.52 million. In addition to the emotional distress damages, medical expenses, and backpay award mentioned above, the jury awarded Baker $600,000.00 in punitive damages on her sexual harassment claim and $50,000.00 in punitive damages on her retaliation claim. Because Iowa law does not provide for punitive damages, Baker, of course, wishes to allocate this latter portion of her award to her Title VII claims.

Based on the persuasive reasoning in both the Eighth Circuit opinion in *Madison v. IBP, Inc.*, 257 F.3d 780 (8th Cir. 2001), *cert. granted, judgment vacated on other grounds*, 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002), and in Magistrate Judge Bremer's trial court decision, 149 F.Supp.2d 730, 731–32 (S.D.Iowa 1999), *aff'd*, 257 F.3d 780 (8th Cir.2001), the court finds that allocating Baker's compensatory damages to her ICRA claims is warranted in this case. In her trial court decision, the reasoning of which the appellate court echoed, Judge Bremer explained the function and importance of reallocating damages to parallel state-law anti-discrimination claims:

"Were we not to treat damages under federal and local law as fungible where the standards of liability are the same, we would effectively limit the local jurisdiction's prerogative to provide greater remedies for employment discrimination than those Congress has afforded under Title VII," in violation of Title VII's express terms. *Id.* at 1349–50 (citing *Kimzey v. Wal–Mart Stores*, 107 F.3d 568, 576 (8th Cir.), *rev'd in part on other grounds*, 124 F.3d 208, 1997 WL 572149 (8th Cir.1997) (unpublished)). Title VII states that nothing in its provisions, "shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State." 42 U.S.C. § 2000e–7.

Courts allocate compensatory damage awards to the state claims and punitive damages to the Title VII claims, "to permit the plaintiff to receive the full amount awarded by the jury without exceeding the legal limits placed upon sexual harassment claims under Title VII and [the state statute]." *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 226 (N.D.N.Y.1999) (internal quotation and citation omitted).

Here, liability standards under federal and state law are the same, but the state law imposes no cap on damages. *See Martini*, 178 F.3d at 1349; *Kimzey*, 107 F.3d at 576; *Funk*, 43 F.Supp.2d at 225; *Passantino*, 982 F.Supp. at 788; *Luciano v. Olsten Corp.*, 912 F.Supp. 663, 674 (E.D.N.Y.1996), *aff'd* 110 F.3d 210 (2d Cir.1997). Unlike Title VII, the ICRA allows no punitive damages. The verdict form did not differentiate between Madison's federal and state damages. In accordance with federal law, the Court did not instruct the jury about Title VII's damages cap. 42 U.S.C. § 1981a(c)(2).

The reasons given in the above cases for allocating compensatory damages to a plaintiff's state claims, and punitive damages to her Title VII claims are persuasive.

*Madison,* 149 F.Supp.2d at 781. Here, too, the court finds reallocation appropriate. Accordingly, the court will allocate the jury's past and future emotional distress damages, past and future medical expenses, and backpay award to Baker's retaliation and sexual harassment ICRA claims, and will allot the punitive damages award to her Title VII claims.

■ John Morrell argues that Baker's future emotional distress awards and future medical expenses cannot be allocated to her ICRA claims because they are not "actual" losses within the meaning of the ICRA, which permits recovery for "actual damages, court costs, and reasonable attorney fees." IOWA CODE § 216.15(8)(a)(8). This argument lacks merit, as illustrated by the Iowa Supreme Court's allocation of a future emotional distress award in *Channon v. United Parcel Service, Inc.,* 629 N.W.2d 835, 851 (Iowa 2001), to the plaintiff's parallel ICRA claims. The court's reasoning in *Channon* is entirely apposite to this court's rejection of John Morrell's narrow interpretation of "actual damages." *See id.* The *Channon* court evinced a "preference for permitting a plaintiff to recover under the liability theory that provides the plaintiff the most complete recovery." *Id.* (citing *Magee v. United States Lines, Inc.,* 976 F.2d 821, 822 (2d Cir. 1992)). The court stated that "[t]his preference is consistent with our goal of damages in civil cases: 'to place the injured party in as favorable a position as though no wrong had occurred.'" *Id.* (quoting *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 421 (Iowa 1983)). Accordingly, the court will not adopt John Morrell's truncated interpretation of relief available under the ICRA and will allocate Baker's past and future emotional distress awards and her past and future medical expenses to her ICRA claims.

### B. Rule 59(e) Motion: Standard of Review

The defendant's arguments challenging the sufficiency of the evidence and the amounts of Baker's compensatory and punitive damages awards were presented by way of its Motion to Amend the Judgment, pursuant to Federal Rule of Civil Procedure 59. The standards governing Rule 59(e) are well-established and must be considered before turning to John Morrell's sufficiency of the evidence and excessive damages arguments.

■ Defendant's Rule 59 Motion to Alter or Amend the Judgment does not seek a new trial on the issue of liability, but rather solely requests a remittitur on the ground of insufficiency of the evidence and, in the alternative, gross excessiveness. When a defendant's Rule 59 motion contests the size of a damage award, a court must decide whether or not the verdict is excessive. *Stern v. Michelangelo Apartments, Inc.,* 2000 WL 33766107, *6 (S.D.N.Y. Jan. 24, 2000). When a district court finds a jury award to be excessive, it may order a new trial exclusively on the question of damages. *See Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995). In the alternative, a district court may grant a remittitur, "condition[ing] a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Id.* Rule 59 motions are committed to the sound discretion of the trial court. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *Hinds v. General Motors Corp.,* 988 F.2d 1039, 1046 (10th Cir.1993). In reviewing a motion for new trial, the court must view the evidence in the light most favorable to the prevailing party.

■ Nevertheless, "[i]n evaluating a motion for a new trial on the grounds that the jury's award was against the weight of

the evidence, the court is not held to the same strict standard that applies to motions for a directed verdict or for a judgment n.o.v. To withstand a motion for a new trial, it is not sufficient that the jury's verdict is supported by substantial evidence; if there is substantial evidence to support the verdict, but the weight of the evidence is against the verdict, the court may order a new trial." *Maylie v. National R.R. Passenger Corp.*, 791 F.Supp. 477, 480–81 (E.D.Pa.), *aff'd*, 983 F.2d 1051 (3d Cir.1992), (citing *Keystone Floor Prods. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 876 (E.D.Pa.1977)).

### B. Emotional Distress Damages

John Morrell argues the award of $735,000.00 for emotional distress is excessive and lacks evidentiary support. The defendant challenges the aggregate total of this award and does not distinguish between the awards for emotional distress on Baker's retaliation, sexual harassment, and constructive discharge claims. The court, however, will look to the individual awards on each of her claims in determining whether each is supported by the evidence and, if necessary, whether each is excessive.

### 1. Sufficiency of the evidence

### a. Applicable standards

■ "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Under Title VII, compensatory damages are available for, among other things, "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The Eighth Circuit Court of Appeals has

held that any award for emotional distress must be supported by competent evidence of a "genuine injury." *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir.1999) (citing *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Emotional distress damages include mental suffering or emotional anguish. The Supreme Court defined "emotional distress" in *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978): "Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

■ While a compensatory damage award may be based solely on plaintiff's own testimony, such testimony should identify and describe the kind of severe emotional distress that would warrant such an award of emotional distress damages. *Forshee*, 178 F.3d at 531 (citing *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 357–58 (8th Cir.1997)); *see also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir.1997) (stating a "plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard.") (citing *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir.1996)). Baker was obligated to offer specific facts as to the nature of her emotional distress and the causal connection to John Morrell's alleged Title VII violations. *See Webner v. Titan Distribution, Inc.*, 267 F.3d 828, 836 (8th Cir.2001); *Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir.1998). However, because it is difficult to quantify in generalized terms

the precise evidence that must be presented, "[e]ach case must be considered on its own facts, with a healthy regard for the prerogatives of the trier of fact and the presiding judge." *Kucia v. Southeast Ark. Cmty. Action Corp.*, 284 F.3d 944, 948 (8th Cir.2002).

### b. Baker's evidence of emotional distress and causation

■ John Morrell claims that the jury's awards for Baker's emotional distress are not supported by specific facts establishing a "genuine injury," nor, according to the defendant, can she show a causal connection between her actual harm and the harassment.[8] Baker strongly disagrees, pointing to her diagnoses of post-traumatic stress syndrome, anxiety, and depression, and to the testimony of her friends, family, and coworkers who each testified as to the marked change in Baker's formerly outgoing and cheerful nature. Today, Baker is, in her brother's words, "broken," isolated and withdrawn.

Contrary to John Morrell's assertion, this case abounds with evidence of "genuine injury." The record demonstrates that the onset of Baker's depression coincided with the escalating harassment pervading her working environment and John Morrell's failure to remedy it; that her psychiatrist and physician testified that her depression and post-traumatic stress syndrome were caused by her treatment at John Morrell; that for considerable periods of time over the next few years her illnesses were severe and physically debilitating; that she attempted suicide and was on medical leave for nearly a year;

that she required psychotropic medications; that because of her post-traumatic stress disorder, also occasioned by John Morrell's unlawful conduct, she suffered debilitating panic attacks; and that these illnesses had a devastating effect on her weight, her family, and her social life.

Roy Baker's, the plaintiff's brother, powerful testimony regarding Baker's emotional downward spiral provides ample insight into the injuries caused by John Morrell's unlawful conduct. When Baker was experiencing significant emotional problems, she oftentimes sought refuge and guidance from her brother. Mr. Baker's testimony revealed the time period in which the discrimination and retaliatory acts occurred, as well as the specific effect these events had on Baker, both physically and emotionally. For instance, Mr. Baker described the emotional toll Baker's treatment at John Morrell had on her as follows:

> [S]he was just getting so distraught and so overwhelmed. She was having breathing difficulties, panic. She would shake like—almost like a vibrator would be hooked to her because she would become so upset about what was happening there and nothing being done. She says, Roy, I'm trying. I don't know what more I can do.

> . . . . .

> [S]he was becoming very shaken, very—just almost broken, crying constantly. And then she said that things were just getting even worse. She says, God help me, Roy. She says, How can this get any worse than what it's get-

---

**8.** For the first time in its reply brief to the plaintiff's resistance to Motion to Amend Judgment, (Doc. No. 160), John Morrell attacks separately the amounts of past and future emotional distress. However, a party cannot properly assert a new argument in a reply brief. N.D. IA. L.R. 7.1(g). Nothing in Baker's resistance would have prompted such an argument in reply. Therefore, the court will not distinguish between amounts awarded for past and future emotional distress but will, like the parties' properly-raised arguments, consider past and future emotional distress damages only in the aggregate.

ting? She said, I didn't think it could, but it is.

. . . . .

[S]he was a shell of a person standing there not even—in my opinion she didn't even know where she was at. She was shaking, bawling very hysterically, and I said, What's wrong, kid? And she was just shaking. She says, They were getting me again.

[Tr., at 232–35].

Baker's doctors, Dr. Jennings and Dr. Muller, similarly described Baker's mental condition and opined it was caused by her treatment at John Morrell, which included the harassment, the retaliation, and John Morrell's response to her complaints. Causation of Baker's mental distress is essentially undisputed in this case—Baker's emotional distress resulted from the nearly daily abuse from Eichmann and Murphy, the lack of any effective response to her complaints, the general working environment for women at John Morrell, and the retaliation by coworkers and her supervisor after she filed a discrimination charge with the EEOC. The jury was instructed, in Final Instruction No. 9, that John Morrell was liable only for those injuries "proximately caused by the wrongful conduct of the defendant." The jury heard evidence that Baker's injuries resulted from being subjected to a hostile work environment, retaliated against, and constructively discharged. John Morrell thoroughly cross-examined Baker's physicians, Baker's witnesses, and Baker with respect to the causation of these damages and other "stressors" in her life, but the jury evidently chose to believe the plaintiff's evidence, which established that her condition was the result of discrimination. It is well-settled that causation is ordinarily left for a jury to determine. *See Exxon Co., USA v. Sofec Inc.*, 517 U.S. 830, 840–41, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) (holding that the issue of proximate causation involves application of law to fact, which should be left to the fact finder, subject to limited review). Here, there was evidence which, if believed, would support the verdict—both as to the existence of a genuine injury and as to its causation stemming from John Morrell's unlawful conduct.

### 2. Excessive verdict

### a. Applicable standards

It is well-settled that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms. *See, e.g., Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir.1988); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 n. 3 (8th Cir.1987); *Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470, 475 (8th Cir.1987); *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1150 (8th Cir.1984). On appeal, the district court will only be reversed for abuse of discretion. *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1061–62 (8th Cir.1993) (citing *Benny M. Estes & Assocs. v. Time Insurance Co.*, 980 F.2d 1228, 1235 (8th Cir.1992)). A district court's refusal to remit an emotional distress award will be reversed only when the appellate court is "pressed to conclude that the verdict represents a monstrous or shocking injustice." *Kientzy*, 990 F.2d at 1061–62 (citation omitted). Thus, this court must consider whether Baker's emotional distress awards are so excessive as to shock the conscience. *Mathieu v. Gopher News Co.*, 273 F.3d 769, 783 (8th Cir.2001) (citing *Verhel v. Independent Sch. Dist. No. 709*, 359 N.W.2d 579, 591 (Minn.1984)). Nonetheless, the court is mindful that "the issue to be decided here 'is not the size of the award alone, but the

evidence supporting the award.'" *Evans v. Port Authority of New York and New Jersey,* 273 F.3d 346, 354 (3d Cir.2001) (quoting *Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 737 (D.N.J.1998)).

### b. Do Baker's awards shock the conscience?

Baker's emotional distress awards are in line with awards in cases in which substantial emotional distress damages have been upheld because of the undisputed, abundant, and corroborated evidence of depression, post-traumatic stress syndrome, anxiety, weight loss, and personality change resulting from harassment retaliation. *See, e.g., O'Rourke v. City of Providence,* 235 F.3d 713, 734 (1st Cir.2001) (emotional distress award of $275,000.00 was not excessive where plaintiff suffered from severe post-traumatic stress disorder resulting from harassment); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 503, 513–14 (9th Cir. 2000) (affirming $1 million emotional distress award for sexual harassment where plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with her pastor); *Madison,* 257 F.3d at 802–802 (affirming $266,750.00 jury award for emotional distress and holding award was not excessive in light of the "voluminous evidence" that the plaintiff suffered emotional distress damages); *Lilley v. BTM Corp.,* 958 F.2d 746, 754 (6th Cir.1992) (upholding a verdict of $350,000.00 for emotional distress damages flowing from the employer-defendant's violation of the Elliott–Larsen Civil Rights Act); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986) (affirming $400,000.00 jury award for emotional distress where "[the plaintiff's] testimony as well as that of other witnesses tended to show a deterioration in his health, mental anxiety, humiliation, and

emotional distress resulting from the conditions under which he worked … and from the discharge"); *Wilson v. General Motors Corp.,* 183 Mich.App. 21, 454 N.W.2d 405, 415 (1990) (even though the plaintiff presented no "expert testimony regarding her mental distress but only testimony as to her own subjective feelings," the appellate court allowed the $375,000.00 award—remitted by the trial court from $750,000.00—of non-economic damages to stand).

In Baker's case, the substantial evidence of her genuine injury supports the jury's sizable damages awards. By all accounts, before the harassment, Baker was a jovial, exuberant, and energetic woman. Baker's brother articulated the toll that the harassment took on Baker's mental well-being:

> For the problems that she came to me about at her place of work and for the ongoing of those situations and that, it took—it took my sister from being a bright-faced, smiley, intelligent, perky, strong individual of a woman, and it stripped her of her dignity, and it demoralized her, and it broke her down in a way that I would hope to never see again or hope that nobody else would ever have to see. She's not my same sister Rita Baker. She's a shell of a person from what the kind of person I had for a sister, just plain and simple. I don't know how to put it any other way.

[Tr., at 246].

Baker's deterioration into the "emotional wreck" that she largely continues to be today was a slow process that began with being sexually harassed by coworkers, which was then exacerbated by her reliance on her employer of 17 years to remedy the problem and her eventual realization that John Morrell was not going to address her complaints. Baker endured several years of demeaning harassment

that was sometimes physically threatening. She lodged dozens of complaints with John Morrell's human resources department but was repeatedly told to "try to get along" with her harassers and was even told that she and her principal harasser, Jeff Eichmann, simply had a "hard on" for one another. After contacting the Sioux City Human Rights Commission, Baker demanded that John Morrell provide training on the mandates of Title VII to her harassing coworkers and that John Morrell provide them with an "harassment is illegal" poster, but John Morrell refused, opting instead to sweep Baker's complaints under the rug as it had for years and to only superficially acknowledge the hostile working environment and never to fully address them nor to hold her harassers accountable for their reprehensible conduct.

John Morrell viewed Baker's complaints as a nuisance. For asserting her rights, the jury heard evidence that Baker's supervisor, Kathi Brown–Rowley, made Baker's job more difficult and discouraged her from reporting the continued harassment. Baker was a dedicated employee who did nearly everything within her power to improve her working conditions, but was met at each step by denial and retaliation. Her emotional distress was heightened by her sense of betrayal when John Morrell, her employer of 17 years, began retaliating against her for complaining about the harassment and, ultimately, constructively discharging her by failing to remedy the harassment. Because of the longevity of her tenure at John Morrell, she felt rejected, betrayed, hopeless, and discarded by John Morrell.

Baker felt particularly dejected by Steve Joyce's, the director of human resources, handling of her complaints. When Baker complained, Joyce performed a perfunctory investigation and rarely disciplined the harassers. In fact, Eichmann was only disciplined on a single occasion with a letter of reprimand in his personnel file for his harassment of Baker, despite her numerous complaints about his conduct. A prime illustration of Joyce's *laissez faire* attitude in the face of an objectively obvious hostile working environment occurred when Baker returned to work after walking off the job. Even though Baker's brother, in October of 1998, had specifically told Joyce that Baker was being unlawfully harassed in the work place and even though Windle had told Joyce that Baker abandoned her position because she could no longer tolerate Eichmann's and Brian Murphy's harassment, which was evidenced in Joyce's notes of his conversation with Windle, upon Baker's return to work, Joyce merely instructed Eichmann and Murphy to treat Baker "civilly, politely, [and to] treat her no different than any other employee." [Tr., at 1408]. Consistent with his "see no evil, hear no evil" policy, Joyce refused to place blame on Eichmann or others for their conduct. If Baker and her harassers did not agree on what transpired between them, Joyce simply concluded there was insufficient evidence to support Baker's allegations and instructed the parties to "get along." This policy of deliberate indifference perpetuated a pattern of unremedied sexual harassment in which Baker's harassers did not concern themselves about the security of their jobs or disciplinary action resulting from their conduct because it was clear that, so long as they contradicted Baker's version of events, they would not be punished harshly, no matter how egregious the complained-of conduct was. The policy also proved ineffective against the retaliation Baker faced after she filed discrimination charges, as evinced by Joyce's identical handling of Baker's complaints against Brown–Rowley and the continued retaliation. After years of un-

remedied harassment, it was clear that John Morrell was unwilling to take action, and Baker was constructively discharged.

Baker testified that, as a result of the harassment, retaliation, and constructive discharge, she suffered from anxiety, panic attacks, depression, despair, sleeplessness, and weight loss. Baker's treating physician and her psychologist both corroborated this testimony and testified that Baker suffered from post-traumatic stress syndrome and severe depression because of her treatment at John Morrell, which the jury found constituted sexual harassment and retaliation. They prescribed anti-depressants and anti-anxiety medications in order to help Baker cope with the physical and emotional manifestations of her conditions.

In April of 2001, Baker became so depressed by her working conditions that she attempted to commit suicide by overdosing on these medications. When Baker regained consciousness in the hospital after this suicide attempt, the first words out of her mouth were "sorry, John Morrell; I'm a whore," and while she was in and out of consciousness, she repeated "John Morrell" several times. [Tr., at 240]. Baker remained hospitalized for five days. Clearly, her treatment at John Morrell had taken an extraordinary toll on her emotional well-being. As a result of her fragile emotional state after this suicide attempt, Baker's psychiatrist, Dr. Muller, restricted her from work for ten months. He did not clear Baker to return to work until February of 2002, at which time Baker was constructively discharged.

Baker's frail emotional condition was readily apparent in her physical appearance. Her brother, Roy Baker, and her long-time friends and co-workers, Debra Canady and Gloria Windle, each testified as to the marked change in Baker's behavior after the harassment began and in Baker's deterioration as the harassment continued unabated for years, despite her numerous complaints to management. Windle and Mr. Baker were both so concerned about Baker's emotional state that they each independently recommended to Baker that she seek medical care. These recommendations were prompted by their observation of Baker and Baker's reaction to her treatment at John Morrell. Windle testified that, when she would visit Baker's home, Baker was in bed all the time or drinking alcohol and having anxiety attacks that caused Baker's chest to hurt. Mr. Baker testified that Baker cried uncontrollably, and he described Baker's tangible sense of hopelessness.

Given the years of unremedied harassment, Baker's long-time relationship with John Morrell, the severity of the harassment, the appalling disregard for her rights, and, most importantly, the incredible toll that the sexual harassment, retaliation, and constructive discharge took on Baker's emotional and physical health, the court cannot say that emotional distress awards totaling $735,000.00 are monstrous, nor do they shock this court's conscience. *See Kientzy*, 990 F.2d at 1061–62 (citation omitted). The sexual harassment, retaliation, and constructive discharge drained Baker and left her emotionally wrought and physically weak—in Mr. Baker's words, "a shell of a person." Her distress continues to the present time, and she continues to seek professional care for her depression and anxiety. In light of the considerable evidence that was before the jury, this court concludes that, while substantial, the awards for emotional distress damages are not grossly excessive but, in fact, in light of the evidence, are fair and reasonable to compensate Baker for the devastating effect John Morrell's unlawful conduct had, and continues to have, on her emotional and physical health. *Cf. State*

*Farm Mut. Auto. Insurance Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003) ("Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'") (quoting *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)).

The Court of Appeals for the Fourth Circuit succinctly explained the importance of a jury's evaluation of a plaintiff's emotional distress:

> "A jury's award of damages stands unless it is grossly excessive or shocking to the conscience." *O'Rourke v. City of Providence,* 235 F.3d 713, 733 (1st Cir. 2001) (internal quotation marks omitted); *see also Hetzel v. County of Prince William,* 89 F.3d 169, 171 (4th Cir.1996) (holding that a jury's award of compensatory damages will be set aside on the grounds of excessiveness only if the verdict is against the clear weight of the evidence or will result in a miscarriage of justice). Courts defer to a jury's award of damages for intangible harms, such as emotional distress, "because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Giles v. Gen. Elec. Co.,* 2001 WL 184579, at *9 (5th Cir. Feb. 26, 2001) (upholding award of $100,000 in compensatory damages for ADA plaintiff who suffered sleeplessness, headaches, marital difficulties and lost "the prestige and social connections associated with his position" as a result of employer's actions).

*Fox v. General Motors Corp.,* 247 F.3d 169, 180 (4th Cir.2001); *accord Jenkins v. McLean Hotels, Inc.,* 859 F.2d 598, 600 (8th Cir.1988) (stating that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms).

Similarly, this court has previously commented on the importance deferring to the jury's assessment of emotional damage:

> [A] jury of peers represents a cross section of the citizens of the Northern District of Iowa and a reflection of its diversity. This civil jury with their varied life experiences, including many with knowledge about factory work and related blue collar employment, embody a collective knowledge and wisdom about the effect of losing a job that is far superior to the vast majority of life tenured Article III trial judges (and I might add appellate judges) who presumably have less life experience, knowledge, or personal concern about losing one's job—especially a factory job.

*Webner v. Titan Distribution, Inc.,* 101 F.Supp.2d 1215, 1226 (N.D.Iowa 2000), *aff'd in part, rev'd in part,* 267 F.3d 828 (8th Cir.2001). Here, the record is replete with evidence of psychiatric problems, severe emotional distress, and large hospital and medical expenses, all causally linked to Baker's mistreatment at John Morrell's hands. Given this evidence, awards of $300,000.00 for sexual harassment, $85,000.00 for retaliation, and $350,000.00 for constructive discharge seem well within bounds. Therefore, the court will not disturb the jury's awards for past and future emotional distress and will turn next to Baker's request for pre-judgment interest on her awards for past emotional distress and medical expenses.

## C. Pre–Judgment Interest on State–Law Claims

■■■ Moreover, in her Motion to Alter or Amend Judgment, Baker requested pre-judgment interest on her backpay

award, past emotional distress awards, and past medical expenses award. Iowa law provides that interest shall be allowed on all money due on judgments and court decrees. IOWA CODE § 535.3. Iowa courts have generally construed this provision as mandatory, *Pioneer Hi–Bred Internat'l v. Holden Found. Seeds, Inc.,* 35 F.3d 1226, 1246 (8th Cir.1994) (citations omitted), and, except for interest awarded for future damages, interest accrues "from the date of the commencement of the action." IOWA CODE § 668.13.

In order to fully compensate Baker and because of the mandatory nature of the Iowa statutory provision concerning interest on judgments, Baker's request for pre-judgment interest for backpay, past emotional distress awards, and past medical expenses is granted. Thus, Baker is entitled to pre-judgment interest on $522,784.97 of her total award. Because the question of pre-judgment interest is a substantive one, controlled by state law, pre-judgment interest shall be calculated at the statutory rate set forth in Iowa Code section 668.13(3), with interest accruing from the date of the commencement of her action, or January 24, 2001. *See Emmenegger v. Bull Moose Tube Co.,* 324 F.3d 616, 624 n. 9 (8th Cir.2003) (rejecting appellant's assertion that pre-judgment interest should be calculated pursuant to the statutory rate available under federal, as opposed to state, law). Interest shall be computed on a simple basis. *See Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 896 (Iowa 1990). Pursuant to federal law, postjudgment interest on the totality of Baker's awards shall be computed pursuant to 28 U.S.C. § 1961.

Having disposed of the issues raised regarding Baker's compensatory damages, the court will next consider the myriad of arguments surrounding Baker's punitive damages award.

### D. Punitive Damages

Punitive damages are available in Title VII cases when the defendant employer engages in a discriminatory practice with "malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *accord Beard v. Flying J, Inc.,* 266 F.3d 792, 800 (8th Cir.2001) (citing 42 U.S.C. § 1981(a)(1), (b)(1)); *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 843 (8th Cir.1998); *Summit v. S–B Power Tool,* 121 F.3d 416, 422–23 (8th Cir.1997); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1214 (8th Cir.1996); *see also Kim v. Nash Finch,* 123 F.3d 1046, 1066 (8th Cir.1997) (punitive damages are available under Title VII under the same standard as under 42 U.S.C. § 1981). "It should be presumed a plaintiff has been made whole for his [or her] injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment and deterrence." *State Farm Mut. Auto. Insurance Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003) (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Absent a showing that a punitive damages award unreasonably "exceeds an amount that will accomplish society's goals of punishment and deterrence," or is somehow violative of due process, courts should respect the jury's imposition of damages. *See Pacific Mut. Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir. 1984) ("Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury").

In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court held that punitive damages liability can be imposed on an employer when "an employee serving in a managerial capacity committed the wrong while acting within the scope of his employment." *Id.* at 543, 119 S.Ct. 2118. However, the Court further held that "an employer cannot be held vicariously liable for the discriminatory employment decisions of managerial agents where [those] decisions are contrary to the employer's good faith efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. 2118.

In this case, John Morrell argues that the evidence does not support the jury's award of punitive damages because Baker failed to prove that John Morrell acted with "malice or reckless indifference" to her federally protected rights. In the alternative, John Morrell claims that, even if the court concludes that the evidence supports the jury's finding that John Morrell acted with malice or reckless indifference, Baker should be ordered to remit the award on the ground that the award is excessive in light of the evidence. The court will address these contentions in turn.

Baker alleges that John Morrell was aware of the hostile and offensive conduct permeating her work place, but, despite its knowledge, John Morrell took no remedial measures aimed at eradicating the harassment and discrimination. Baker points to extensive record evidence to show that she filed numerous complaints but that John Morrell failed to prevent the discriminatory conduct she was subjected to.

### 1. Applicable standards

In considering whether John Morrell acted with malice or reckless indifference, thus warranting punitive damages, the court must view the evidence in the light most favorable to Baker. *See Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir.2002); *Denesha v. Farmers Insurance Exch.*, 161 F.3d 491, 503 (8th Cir.1998) (considering challenge to punitive damages award under abuse of discretion standard, which requires the court to view the evidence in the light most favorable to the prevailing party). "Federal law imposes a formidable burden on plaintiffs who seek punitive damages" in employment discrimination cases. *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 618 (8th Cir.2000). The question the court must answer is "whether the present record contains sufficient evidence to 'reveal whether a reasonable jury could have found' [John Morrell] liable for punitive damages." *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1009 n. 16 (8th Cir. 2000) (quoting *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598–99 (8th Cir.1999)). To determine whether Baker met her burden, the court must ensure that the punitive damages standards as announced in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), have been met, even though *State Farm* was not decided until after the trial in this case. *See Ogden*, 214 F.3d at 1009 n. 16 (applying *Kolstad* intent and agency standard to pre-*Kolstad* trial and stating that the court must "apply the law as it exists today, 'not what the court announced the law to be in its instructions.'") (quoting *Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1280 (8th Cir.1994)) (citing *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (Supreme Court decisions apply retroactively and prospectively to all cases on direct

appeal whenever applied to the litigants before the Court)).

### 2. Malice or reckless indifference

■ The three-part framework developed by the Supreme Court to determine whether a prevailing Title VII plaintiff is entitled to punitive damages requires the court to consider whether the plaintiff established the following: (1) that the employer acted with the requisite mental state, *i.e.*, that the employer acted "in the face of a perceived risk that its actions will violate federal law," *Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118; (2) that liability may be imputed to the defendant employer by showing that the employees who discriminated against the plaintiff are managerial agents acting within the scope of their employment, *id.* at 539, 119 S.Ct. 2118; and, (3) even if the plaintiff establishes that the employer's managerial agents recklessly disregarded her federally protected rights, that the employer failed to engage in good faith efforts to implement an anti-discrimination policy, *id.* Here, John Morrell does not dispute that Joyce and Brown–Rowley are managerial agents who Baker contends discriminated against her. Thus, the court will address only the first and third parts of this analytical framework.

Throughout the trial in this case, John Morrell attempted to show that the atmosphere Baker claimed constituted a sexually hostile working environment was nothing more than "normal workplace conduct" on the cut floor of a meat packing plant. In addition, because Baker did not use the magical phrase "sexual harassment" when she lodged more than a dozen complaints about her maltreatment, John Morrell attempted to show that its response to her complaints was adequate. In *Flockhart v. Iowa Beef Processors, Inc.*, 192 F.Supp.2d 947 (N.D.Iowa 2001), Judge Michael Melloy,[9] addressed a similarly disturbing hostile working environment in a meat packing plant and summarized the defendant's position in what could be substituted as an excerpt from John Morrell's litigation "play book":

> As the undersigned indicated at the conclusion of the trial, the facts of this case reveal a sad and disturbing pattern of conduct by IBP employees and management. Not only was the plaintiff the victim of pervasive sexual harassment, it is clear that the harassment took place in a climate in which women were routinely the subject of sexual taunting, groping, and extremely demeaning conduct. More troubling is the fact that IBP seems to take the attitude that it is powerless to address the issues of sexual harassment and, when confronted with complaints made by persons such as Ms. Flockhart, any investigation was directed more towards disproving the claim, as opposed to a search for truth and implementation of effective remedial measures.

*Id.* at 965.

There are a variety of ways a plaintiff can show her employer's reckless disregard for her federally protected rights. The Supreme Court clarified that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535, 119 S.Ct. 2118. For that reason, the Court remarked that this factor would not be satisfied when the employer was unaware

**9.** Judge Michael J. Melloy was appointed to the Eighth Circuit Court of Appeals in March of 2002. The *Flockhart* decision was issued by Judge Melloy while he was a District Judge.

of the federal prohibition or acted with the distinct belief that its discrimination was lawful. *Id.* The *Kolstad* Court further explained that, although conduct justifying a punitive damages award is sometimes characterized as egregious or outrageous, it "is not to say that [defendants] must engage in conduct with some independent, 'egregious' quality before being subject to a punitive award." *Id.*

At the outset, the court notes that there is ample evidence in the record that John Morrell acted with actual malice. For instance, Joyce admitted to responding to one of Baker's complaints by telling her that she and Eichmann had a "hard on" for each other. Moreover, when Baker voiced her desire to lodge further complaints after she filed her discrimination charge with the EEOC, her supervisor, Kathi Brown–Rowley, told her to "shut the fuck up" and discouraged her from reporting the harassment to Joyce because he was "sick of her shit." These instances, alone, support an award of punitive damages, but the court will also consider whether John Morrell's actions amount to deliberate indifference of Baker's federally protected rights because the evidence of deliberate indifference permeates this case.

Baker reported being harassed by Eichmann, Murphy, and others to Joyce upwards of fifteen times. She also reported the harassment to her supervisor, Brown–Rowley, as well as to Brown–Rowley's predecessor. Brown–Rowley testified she witnessed some of the harassing conduct on the line, though she denied that the conduct she witnessed was discriminatory. Baker testified that sometimes Joyce would talk to the harassers and, for awhile, the situation would improve. The improvement, however, was, in each instance, short-lived and would begin anew. Joyce took copious notes of Baker's complaints, and at trial he did not dispute that Baker was a frequent visitor to his office. However, despite the years of complained-of conduct, Joyce was adamant that the complained-of conduct did not alert him to the possibility that Baker was being subjected to "sexual harassment"—this, despite the fact that her brother, Mr. Baker, had specifically told Joyce that laws prevented the type of behavior occurring at John Morrell, Eichmann's candid admissions to Joyce that he discussed and teased Baker about sexually explicit stories and rumors, Walter Busch's (a coworker at John Morrell) report to Joyce that Baker had problems with Murphy because she refused to go out with him, and Baker's complaints about being called a "bitch" and a "stupid bitch."

As the director of human resources at John Morrell, Joyce was charged with enforcing the mandates of Title VII. As such, he is familiar with Title VII's prohibitions and requirements. Instead of responding to Baker's complaints with actions calculated to put an end to the harassment, he repeatedly told Baker and her harassers to "get along" with each other, and he even told Baker that she and Eichmann merely had a "hard on" for one another. Despite Baker's and several other female employees' numerous complaints about Eichmann, Eichmann was only formally disciplined on two occasions. On the first occasion, he was suspended for assaulting a female coworker. The second reprimand came in the form of a disciplinary letter placed in Eichmann's personnel file regarding his behavior that led to Baker walking off the job in December of 1999. Notably, this was the *only* complained-of incident that led to disciplinary action in spite of the numerous and oftentimes more severe incidents of harassment that Baker reported prior to that time, and it is, at minimum, curious that it did not take place until

Baker filed her charge of discrimination with the EEOC.

In *Flockhart v. Iowa Beef Processors, Inc.*, 192 F.Supp.2d 947 (N.D.Iowa 2001), the district court upheld the jury's imposition of punitive damages in a case not unlike this one. In *Flockhart*, there was significant evidence that the employer, IBP, had misled the plaintiff about its investigations of her harassment complaints and had lied about when it became aware of the veracity of those complaints by way of an admission on the part of the offending employee. *Id.* at 977. In this case, there is no evidence of intentional falsehoods. However, like *Flockhart*, this case is infested with evidence that John Morrell did not take Baker's complaints seriously. The human resources director, Mr. Schwenneker, in *Flockhart*, performed the same cursory investigation in that case which resulted in the court's finding of reckless indifference. When the *Flockhart* plaintiff complained, Mr. Schwenneker interviewed her, the offending coworker, and potential witnesses. *Id.* at 954. When the offending coworker denied the plaintiff's allegations, Mr. Schwenneker concluded he could not resolve their conflicting accounts and could not determine who was telling the truth. *Id.* Therefore, he told both parties to avoid each other, despite the impossibility of this directive given their work assignments. *Id.* Moreover, as in Baker's case, several female employees corroborated the *Flockhart* plaintiff's testimony regarding the derogatory comments directed at women at IBP. *Id.* at 956.

At trial, Baker's witnesses, Deb Canady, Gloria Windle, Kay Nilson, and Georgia Risley, each testified as to their complaints concerning Eichmann's maltreatment of them and women in general at John Morrell. John Morrell's witness, Marilyn Alcantar, a supervisor on the plant floor, similarly testified about Eichmann's behavior, his particularly harsh treatment of women, and the negative attitude and perception of women working in the meat packing industry that permeates the plant atmosphere at John Morrell. Ms. Alcantar testified that it is still a "man's world" at John Morrell, and John Morrell's handling, or lack thereof, of Baker's complaints illustrates how deeply imbedded this attitude is because, even at this stage in the litigation, John Morrell continues to characterize Baker's treatment as "normal."

There was also evidence presented in this case about the sexually explicit and derogatory gestures and comments made to women in John Morrell's breakroom. For example, female employees were met by lewd gestures and comments when they attempted to perform simple tasks, such as apply lip balm, eat hot dogs and bananas, or bend over. Such conduct in the breakroom and on the plant floor was in plain sight and within earshot of supervising employees. Based on the totality of the evidence in this case, there is no doubt that John Morrell was aware of the degradation of its female employees in general and, specifically, of Baker. There was no evidence that John Morrell took any action to remedy the generalized hostility against women at the plant, and Joyce's responses to Baker's complaints were superficial, were themselves damaging, *i.e.*, Joyce's "hard on" comment, and were proven ineffective by Baker's continued maltreatment over a period of nearly seven years of unremedied harassment. John Morrell's awareness of the hostile environment, coupled with its ineffective responses to numerous complaints, convince this court that there was sufficient evidence to support the jury's determination that John Morrell acted with malice or reckless indifference to Baker's federally protected

rights.[10]

In support of its contention that Baker has not met her "formidable burden" of showing entitlement to punitive damages, John Morrell cites *Webner v. Titan Distribution, Inc.*, 267 F.3d 828 (8th Cir.2001), *Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631 (8th Cir.1998), and *Varner v. National Super Markets, Inc.*, 94 F.3d 1209 (8th Cir.1996). Comparison to these cases, however, is unavailing.

In *Webner,* the Court of Appeals for the Eighth Circuit held that application of punitive damages was inappropriate, even though the plaintiff proved disability discrimination, because the employer's "actions were consistent with an employer acting to protect itself against the possible sporadic absence of an employee." *Webner,* 267 F.3d at 837. The Eighth Circuit's decision in *Webner* was based on the Supreme Court's holding in *Kolstad* that delineated specific situations in which punitive damages were inappropriate despite an employer's intentional discrimination. *See id.* In *Kolstad,* the Supreme Court explored the "malice or reckless indifference" standard of the punitive damages provision of the Civil Rights Act of 1991. *See Kolstad,* 527 U.S. at 536–37, 119 S.Ct. 2118. The Court determined that, to warrant punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536, 119 S.Ct. 2118.

Nevertheless, the Court held that, even in the face of such a risk, there are four instances in which intentional discrimination will not give rise to punitive damages

liability. *Id.* at 537, 119 S.Ct. 2118. One such instance was present in *Webner:* "an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id.; see Webner,* 267 F.3d at 837 (citing *Kolstad,* 527 U.S. at 536–37, 119 S.Ct. 2118). In *Webner,* the Court of Appeals determined that Titan's stated reasons for discriminating against the plaintiff—"that his back injury precluded him from performing all but light duty tasks, Titan was fearful that Webner would reinjure his back, and Titan did not have a job suited to his disability"—fell into the category of unlawful employment discrimination cases that the *Kolstad* Court held was not "malicious or reckless indifference" conduct within the meaning of 42 U.S.C. § 1981a. *See Webner,* 267 F.3d at 837.

In this case, John Morrell has not argued that any one of the *Kolstad* Court's four delineated circumstances where intentional discrimination does not give rise to punitive damages liability under the "malice" and "reckless indifference" standard applies. For that reason, *Webner* is inapposite to Baker's case.

The Eighth Circuit also held that punitive damages liability was not appropriate in *Browning.* *Browning,* 139 F.3d at 636–37. In *Browning,* the race discrimination plaintiff prevailed at trial against his employer, Riverboat, proving that Riverboat terminated his employment as a security manager because of his race. *Id.* at 633. To support his punitive damages claim on appeal, the plaintiff pointed only to Riverboat's intentional discrimination and an al-

---

**10.** The court has focused its analysis of the sufficiency of evidence supporting the punitive damages award on Baker's sexual harassment claim. This is so because the jury awarded $650,000.00 in punitive damages on that claim, which exceeds Title VII's damages

limitation. However, for the reasons articulated above and recounted in both this Order and the court's March 17, 2003 Order, Baker's retaliation claim also supports an award of punitive damages.

leged failure by a high-ranking executive to meaningfully investigate Browning's discrimination charge. *Id.* at 637. The Court of Appeals for the Eighth Circuit held that this evidence did not support a finding that Riverboat acted with either malice or reckless indifference. *Id.*

In stark contrast to the *Browning* case, the jury found that John Morrell failed to meaningfully investigate Baker's claims and to take appropriate remedial action calculated to end the harassment. [Final Instr. No. 3]. There is no indication in *Browning* that the plaintiff lodged any complaints until he was terminated. Moreover, he worked for Riverboat for a short sixty-seven day period. *Browning,* 139 F.3d at 634. Baker worked for John Morrell for over seventeen years, and she personally lodged more than fifteen complaints to Joyce and countless others to her supervisors and union representatives over the course of seven years. In contrast, Browning alleged a single failure to meaningfully investigate his complaints. *Id.* This single incidence of alleged deliberate indifference was insufficient to "r[i]se to the level to support a punitive damages award." *Id.* at 637. Viewing the evidence in the light most favorable to Baker, the jury could reasonably have concluded that John Morrell's response to Baker's years of unremedied complaints constituted a pattern of deliberate indifference that, unlike in *Browning,* rose to the level to support punitive damages liability because of the frequency of Baker's complaints, the duration of the harassment, the similar complaints by other employees, and the fact John Morrell's responses to Baker's complaints had proven ineffective yet they continued to be implemented until John Morrell took Baker's complaints seriously when she filed a discrimination charge with the EEOC.

Like *Browning,* the Court of Appeals for the Eighth Circuit, in *Varner,* held that the Title VII sex discrimination plaintiff failed to show that the defendant employer engaged in discrimination with the requisite "malice or reckless indifference" to federally protected rights even though the plaintiff proved that the defendant was on notice of the harassment. *Varner,* 94 F.3d at 1214. In *Varner,* a fifty-one year-old male coworker taunted the seventeen year-old plaintiff with sexually explicit comments and pornography over the course of several weeks. *Id.* at 1211. This taunting escalated to an assault on the plaintiff when the male coworker grabbed her from behind. *Id.* Varner did not report this incident, but her fiancé contacted the store manager. *Id.* The manager told Varner's fiancé that he could not take any action unless Varner personally reported the incident to him, and he advised her that reporting it might worsen the situation. *Id.* Varner chose not to pursue this incident further. *Id.*

The coworker again assaulted Varner three or four months after the first assault. *Id.* On this occasion, which caused her considerable emotional distress, her fiancé again contacted the store manager who responded, "That's just Bob being himself." *Id.* Varner contacted the police about the assault the following morning, and the coworker was arrested. *Id.*

The defendant's sexual harassment policy, which Varner agreed to acquaint herself with upon commencement of her employment, directed employees who believed they were victims of sexual harassment to contact the human resources department of the labor relations department. *Id.* at 1212. Supervisors who learned of harassment were expressly directed not to take any action but instead were instructed to refer ag-

grieved employees to one of these departments. *Id.*

Baker's case contrasts sharply with *Varner* because, in *Varner*, the plaintiff never personally voiced any complaints. It is undisputed that Baker voiced many complaints and utilized the proscribed chain of command. Thus, Baker did not confine her complaints to a single, indifferent John Morrell agent. Instead, she complained about her maltreatment to Joyce, Brown–Rowley, and her former supervisor. She also complained to the union steward and fellow employees, who relayed her complaints to Joyce. None of John Morrell's agents took Baker's complaints seriously nor instituted remedial measures apart from Joyce and Brown–Rowley instructing Baker and Eichmann to "get along."

A case significantly more analogous to Baker's is *Henderson v. Simmons Foods, Inc.,* 217 F.3d 612 (8th Cir.2000). In that Title VII sexual harassment case, a female employee brought suit against her former employer for failing to remedy a hostile work environment and for constructively discharging her. *Id.* at 613. She prevailed at trial on both claims, recovering compensatory and punitive damages. *Id.* In *Henderson,* the plaintiff was subjected to two years of sexual harassment, which she reported to supervisors over 40 times. *Id.* at 619. The defendant employer refused to act absent corroboration of the plaintiff's complaints, refused to transfer either the plaintiff or her harassers so that they would not be working in close proximity, and, after being faced with denials by the offending employees, simply instructed them that they could be terminated for sexual harassment. *See id.* at 614–15. The company also issued the plaintiff a stern warning about the severity of the complaints she was voicing. *See id.* at 614.

The *Henderson* court distinguished the facts of that case from *Varner* and held that "[s]uch evidence of deliberate indifference supports an award of punitive damages." *Id.* at 619. The court reasoned that the defendant's act of "downplaying" the plaintiff's complaints, placing her in close proximity to her harasser, and turning a "deaf ear" on a particularly egregious incident amounted to reckless indifference of her federally protected rights. *See id.*

The record in Baker's case abounds with evidence of deliberate indifference that, like in *Henderson,* supports punitive damages liability. For example, during Joyce's investigation after Baker walked off the job in December of 1999, Joyce learned of incidents of harassment and retaliation, corroborating the conduct Baker regularly complained of, which he would have learned of sooner had he performed more than a cursory investigation of Baker's complaints. For instance, Joyce's notes indicate that Eichmann relayed sexually explicit stories about Baker to him and that Mr. Busch corroborated Baker's allegation that Murphy harassed her because she would not go on a date with him and that Brown–Rowley said she was "sick of" Baker's "bitching." However, Joyce never followed up on these revelations, nor even questioned Brown–Rowley about her comments. [Tr., at 1440–1523; Exh. H generally].

Most telling of John Morrell's reckless indifference is, again, the fact Baker complained about harassment and disparate treatment for over five years but was forced to quit in order to escape the hostile work environment. Moreover, other female employees also complained about Eichmann's conduct toward them. However, despite years of complaints, no formal disciplinary action was taken, even though cursory investigations were performed, and the harassment did not end. John Morrell did not take Baker seriously until she filed a charge of discrimination

with the EEOC. Further, the discriminatory atmosphere that permeated the plant floor and the use of gender-specific derogatory comments, such as "bitch," and gestures were prevalent and known to John Morrell's supervisory employees. Still, John Morrell turned a blind eye on Baker's complaints, instead attributing her grievances to "normal workplace conflict" that John Morrell was powerless to remedy.

*Howard v. Burns Bros., Inc.*, 149 F.3d 835 (8th Cir.1998) also supports Baker's contention that John Morrell's response to her complaints amounted to reckless indifference to her federally protected rights. In that case, the plaintiff was the assistant manager of a truck stop, and she was harassed by a male coworker. *Id.* at 838. The harassment consisted of the use of sexual innuendos, comments regarding the plaintiff's physical appearance, lewd gestures, and brushing up behind the plaintiff as they worked. *Id.* The plaintiff complained about the offending co-employee's conduct to the store manager and general manager several times. *Id.* Other female employees lodged similar complaints. *Id.* The defendant, however, did not take action and reprimand the harasser until another female employee threatened to report the harassment to corporate headquarters. *Id.* at 839. As a result of that complaint, the general manager of the truck stop issued the harasser a "final warning." *Id.* This warning came over two years after the plaintiff had first complained about the harassment. *See id.* After he was reprimanded, the harassment stopped, with the exception of one isolated comment. *Id.*

The plaintiff sued her employer under Title VII for maintaining a sexually hostile work environment and for constructively discharging her in retaliation for complaining about the harassment. *Id.* at 840. The jury found in her favor on both claims, though the Court of Appeals for the Eighth Circuit overturned the verdict for Howard on her constructive discharge claim. *See id.* Pertinent to Baker's case, the court upheld the jury's finding that the defendant maintained a sexually hostile work environment and further found that the jury's awards of compensatory and punitive damages were supported by the evidence in a case where the defendant's response over a period of years to complaints by the plaintiff and by other female employees is remarkably similar to John Morrell's conduct. *See id.*

The *Howard* court reasoned that "[m]anagement's practice of turning a blind eye to repeated complaints of misconduct was sufficient to demonstrate 'reckless indifference' ...." *Id.* at 844 (citing *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 576 (8th Cir.1997)). The court summarized the essence of this "blind eye" practice as management's ignoring of complaints about the male coworker's conduct from the plaintiff and others over a period of two to three years. *See id.* John Morrell's similar practice in not reprimanding Eichmann, in particular, in the face of many years of repeated complaints from Baker and other employees is sufficient to justify an award of punitive damages under section 1981a's recklessly indifferent standard. While it is true that the employer in *Howard* took no action until an employee threatened to report the conduct to corporate headquarters and John Morrell undertook a cursory investigation, the end result of these two employers' responses to complaints of harassment was the same—the harassers were not disciplined (apart from what can be characterized as nothing more than a slap on the wrist) and the harassment continued unabated for years.

John Morrell's attitude about sexual harassment is also similar to that evinced in *Madison v. IBP, Inc.*, 257 F.3d 780 (8th Cir.2001), *cert. granted, judgment vacated on other grounds,* 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002). In that case, punitive damages were upheld where managerial employees were among those who harassed and abused the plaintiff; where management ignored her complaints and failed to investigate her allegations; where management did not discipline the harassers; and where there was evidence that the employer's sexual harassment policies were not carried out. *Id.* at 795–96.

The court is disturbed by the resemblance between Baker's case and *Madison* and *Flockhart,* which the court discussed above. Each of these cases involved meat packing plants in Iowa. What is most telling of the pervasiveness of the harassment in these cases is the defendants' views that the conduct, which a jury of their peers found to be unlawful, is normal and acceptable workplace behavior in the meat packing industry. Like John Morrell, the defendants in *Flockhart* and *Madison* took the position that the discriminatory attitudes and degrading conduct that permeated their factories were permanent fixtures in the plants, even if unlawful. Their attitudes are also the precise type of discrimination that Title VII aims to eradicate in making sexually hostile work environments actionable. The very nature of punitive damages seeks to punish defendants and to deter them and others like them from engaging in like conduct. *Cf. Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (purpose of puni-

tive damages is to punish and to deter); *BMW,* 517 U.S. at 568, 116 S.Ct. 1589 (same); *Pacific Mut. Life Insurance Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (same). For that reason, Baker's case presents an exemplary case for punitive damages liability because it is clear, at least in Iowa, as judging by Baker's case, *Madison,* and *Flockhart,* that meat packing plant defendant employers need a wake-up call and a clear message that the hostile work environments they maintain will not be tolerated simply because it will be difficult to dismantle them in the face of managements' long tradition of turning a blind eye to their existence.[11]

In short, there is abundant evidence in the record to support the jury's finding that John Morrell acted with "malice or reckless indifference" to Baker's federally protected rights. In John Morrell's motion and briefs in support of its Motion to Amend Judgment, John Morrell argues only that punitive damages are not appropriate because it did not act with the requisite "malice or reckless indifference" and, in the alternative, that even if the court were to find that the evidence supported such a conclusion, the court should remit the award. Therefore, John Morrell notably *did not* assert that the third part of the *Kolstad* analytical framework precludes punitive damages liability. Specifically, the *Kolstad* Court held that, despite a finding of "malice or reckless indifference," liability for punitive damages is not appropriate in cases where the employer engaged in good faith efforts to implement an anti-discrimination policy. *See Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118. Even though John Morrell has not asserted this

---

**11.** By noting the similarities among John Morrell's misconduct and the pervasiveness and entrenchment of sexual harassment at the John Morrell plant and at the plants in *Flockhart* and *Madison,* the court in no way has considered this in determining whether punitive damages are appropriate in this case. The similarities are noteworthy because they highlight the need for deterrence in Baker's case.

exemption applies, the court will briefly examine its application to this case.

### 3. Good faith efforts

As noted above, an employer may escape vicarious liability for the discriminatory employment decisions of managerial employees where those decisions are contrary to the employer's "good faith efforts to comply with Title VII." *Ogden*, 214 F.3d at 1009 (citing *Kolstad*, 527 U.S. at 545, 119 S.Ct. 2118). The Supreme Court in *Kolstad* did not define the contours of what measures constitute "good faith efforts," recognizing only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms" and "the purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." *Kolstad*, 527 U.S. at 545, 119 S.Ct. 2118, *quoted in Ogden*, 214 F.3d at 1009.

"Employers have an 'affirmative obligation' to prevent civil rights violations in the workplace." *Madison*, 257 F.3d at 795 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). An existence of a written anti-discrimination policy, standing alone, does not insulate an employer from vicarious liability by establishing it made good faith efforts to comply with Title VII. *E.g.*, *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir.2001) ("Every court to have addressed this issue thus far has concluded that, although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award."); *Romano v. U–Haul Internat'l*, 233 F.3d 655, 670 (1st Cir.2000) ("[A] written non-discrimination

policy is one indication of an employer's efforts to comply with Title VII. But a written statement, without more, is insufficient to insulate an employer from punitive damages liability.") (citations omitted); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir.2000) ("[E]ven if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware."); *Ogden*, 214 F.3d at 1010 (rejecting appellant's contention that written sexual harassment policy established its good faith efforts and stating, " '[p]lainly, such evidence does not suffice, as a matter of law,' to establish 'good faith efforts' ") (quoting *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir.1999)); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 517 (9th Cir.2000) ("[A]n employer must show not only that it has adopted an antidiscrimination policy, but that it has implemented that policy in good faith."). "A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate." *Romano*, 233 F.3d at 670. "Although the purpose of Title VII is served by rewarding employers who adopt anti-discrimination policies, it would be undermined if those policies were not implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees." *Passantino*, 212 F.3d at 517.

Although John Morrell did have a formal non-discrimination policy in place and it did educate its employees about that

policy,[12] Baker introduced evidence at trial that suggested that John Morrell's human resources director and plant floor supervisors effectively disregarded the policy by refusing to remedy Eichmann's harassment even though they knew about it. From the evidence at trial, the jury could have concluded that Joyce's investigation into Eichmann's conduct, as well as those investigations into other incidents reported by Baker, were a sham. If the jury accepted this evidence, which its verdict in Baker's favor suggests it did, then it could have concluded that John Morrell did not make a good faith effort to comply with Title VII despite its formal anti-discrimination policy. *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000). For this reason and for the reasons articulated in the court's "malice or reckless indifference" discussion and in the March 17, 2003 Order, the court finds that the evidence supports the jury's reasonable conclusion that John Morrell should not be exempted from vicarious liability for the malice and reckless indifference on the part of its managerial agents to Baker's right to be protected from sexual harassment. Accordingly, the jury's imposition of punitive damages is justified in this case.

### 4. Amount of punitive damages award

#### a. Application of statutory damages cap provision

The jury in this case awarded Baker punitive damages in the amounts of $600,000.00 on her sexual harassment claim and $50,000.00 on her retaliation claim. The court has, above, determined that punitive damages liability on Baker's sexual harassment claim is fully supported by the evidence in this case. The parties agree, however, that Title VII's statutory limitation on damages, 42 U.S.C. § 1981a, precludes an award in excess of $300,000.00 in this case. Thus, before considering the excessiveness of the punitive damages award, the court will grant John Morrell's Motion to Amend Judgment insofar as it seeks a reduction of the punitive damages award to $300,000.00 in compliance with 42 U.S.C. § 1981a(b)(3).[13]

#### b. Excessive verdict

Arguments that punitive damages awards are excessive fall into two categories: (1) challenges based on the sufficiency of the evidence supporting the amount of the award, and (2) constitutional challenges to the award under the Due Process Clause, which "prohibits the imposition of grossly excessive or arbitrary punishments," *State Farm Mut. Auto. Insurance Co. v. Campbell*, — U.S. —, — – —, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003). The Court of Appeals for the Eleventh Circuit explained the procedural difference between these two categories:

> The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determi-

---

12. The extent of John Morrell's training, however, is questionable. Moreover, Ms. Alcantar, a supervisor, testified that she attended the yearly training and was aware of John Morrell's written anti-discrimination policy, yet she could not testify as to how to spot sexual harassment nor how she, as a supervisor, should respond to a sexual harassment complaint. [Tr., at 1264–67].

13. The relevant statutory provision provides that "the sum of the amount of compensatory damages awarded under [Title VII] for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed... $300,000." 42 U.S.C. § 1981a(b)(3)(D).

nation that the law does not permit the award. Unlike the remittitur, which is discretionary with the court ... a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir.1999); *see also Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049–50 (8th Cir.2002) ("[T]he action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with constitutional limits.... While the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial ... the court's mandatory review of a punitive damages award does not implicate the Seventh Amendment.").

Here, John Morrell argues that there is limited evidence of the reprehensibility of its conduct, and, therefore, the full amount of punitive damages available under 42 U.S.C. § 1981a is not warranted. Baker responded by arguing that the court could not reduce the award below the damages cap unless it was constitutionally excessive, a contention which John Morrell summarily resisted in its sur-reply. Because John Morrell challenges the reasonableness of the punitive damages award under the facts of this case and because the court has an independent duty to ensure that the award does not violate the Due Process Clause of the Fourteenth Amendment to

the United States Constitution, the court will address both issues in turn.

■ "The general rule is that the amount of punitive damages must bear some reasonable relation to the injury inflicted and its cause." *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 805 (Bankr.E.D.Va.1995); *see also BMW*, 517 U.S. at 580, 116 S.Ct. 1589 (explaining that the proper inquiry is whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred); *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992) (punitive damages must be " 'reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' ") (quoting *Pacific Mut. Life Insurance Co. v. Haslip*, 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). In this case, the jury was specifically instructed to use reason in setting the amount of punitive damages and that any award of punitive damages should bear a reasonable relationship to the harm caused to Baker by John Morrell's misconduct.[14]

■ In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court held that the Constitution provides an upper limit on punitive damage awards so that a wrongdoer has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that ... may [be] impose[d]." *Id.* at 574, 116

---

**14.** Final Jury Instruction No. 9, "punitive damages," provides:

In determining the amount of punitive damages, if any, to award on these claims, you should consider how offensive the defendant's conduct at issue in that claim was; what amount is needed, considering the defendant's financial condition, to punish the defendant for its wrongful conduct toward the plaintiff and to prevent a repetition of that wrongful conduct in the future; whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded on that particular claim; and what sum is sufficient to deter other similar employers from similar wrongful conduct in the future.
[Doc. No. 111; Final Instr. No. 9].

S.Ct. 1589. To determine whether a jury award of punitive damages violates a defendant's due process rights,[15] *BMW* instructs courts to consider three guideposts, including (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the plaintiff's compensatory damages and her punitive damages award, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Among other functions, the guideposts "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, —— U.S. at ——, 123 S.Ct. at 1524. While all three guideposts have a bearing on the outcome of a court's decision, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. The Supreme Court recently reiterated the importance of this *BMW* guidepost in *State Farm Mutual Automobile Insurance Co. v. Campbell*, —— U.S. ——, ——, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003).

Citing *BMW*, the *Campbell* Court held that the degree of reprehensibility of a defendant's misconduct should be judged by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated inci-

dent; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, —— U.S. at ——, 123 S.Ct. at 1521 (citing *BMW*, 517 U.S. at 576–77, 116 S.Ct. 1589). Still, "the reprehensibility analysis of the punitive damages in a case does not provide a 'platform to expose, and punish, the perceived deficiencies of the defendant's conduct throughout the country rather than that directed at the plaintiff.'" *Id.* at 1516.

After carefully reviewing the evidence and applying the *BMW* guideposts, the court finds that an award of $300,000.00 is not grossly excessive. In fact, the evidence and the magnitude of the reprehensibility of John Morrell's unlawful conduct in this case supports an award in excess of Title VII's damages cap, were such an award available. In analyzing the reprehensibility of John Morrell's misconduct, the court must view the evidence in the light most favorable to Baker. *See United International Holdings, Inc. v. Wharf (Holdings) Limited*, 210 F.3d 1207, 1230–31 (10th Cir.), *cert. granted in part*, 531 U.S. 978, 121 S.Ct. 425, 148 L.Ed.2d 434 (2000), *aff'd* 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001). John Morrell's conduct was reprehensible and involved retaliation and, at minimum, reckless disregard of federally protected rights. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1067–68 (8th Cir.1997). The ratio between the reduced punitive damages award and the actual harm inflicted, as measured by the jury's awards of backpay and compensatory damages, is nearly 1:3, which is a far cry from proportions that raise any judicial eyebrows. *See Campbell*, —— U.S.

---

**15.** Although *BMW* involved a Fourteenth Amendment due process review of a state's imposition of punitive damages on a tortfeasor, the Court of Appeals for the Eighth Circuit has applied the *BMW* analysis to review a federally imposed punitive damages award in an employment discrimination case. *See Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 619 (8th Cir.2000).

at ——, 123 S.Ct. at 1524 ("We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). Finally, as the Court of Appeals for the Eighth Circuit has noted, Title VII caps damages for the largest employers at $300,000.00; consequently Congress has authorized such a sanction. *Nash Finch*, 123 F.3d at 1068.

In short, a $300,000.00 punitive damages award is an adequate sanction to deter future similar conduct and to punish the extraordinary reprehensibility of John Morrell's misconduct in this case, considering John Morrell's size and its assets. Therefore, the court denies John Morrell's Motion to Amend Judgment insofar as the defendant has requested the court to reduce Baker's punitive damages award below the damages cap of $300,000.00.

## IV. CONCLUSION

The court has reconsidered its March 17, 2003 Order and has concluded that Baker should be allowed to amend her complaint to add parallel state-law sexual harassment, retaliation, and constructive discharge claims under the ICRA. The **Motion to Reconsider**, therefore, **is granted.** Moreover, for the reasons expressed by the Eighth Circuit in *Madison*, 257 F.3d at 801–02, the court finds that allocation of her compensatory damages to her state-law claims is appropriate to further the objectives of Title VII and the ICRA.

Thus, because of the court's allocation of damages, only the punitive damages award is subject to the statutory damages limitation provision, 42 U.S.C. § 1981a(b)(3). The court **grants in part** the **defendant's Motion to Amend Judgment**, reducing the jury's punitive damages award to $300,000.00 but **otherwise denies** the defendant's request to further reduce the award, finding that imposition of punitive damages is appropriate and that their magnitude is supported by the evidence and comports with John Morrell's due process rights.

Moreover, the court **grants** the plaintiff's Motion to Amend Judgment insofar as she requested **pre-judgment interest on her backpay, past emotional distress awards, and past medical expenses**, which are now allocated to her state-law claims. She is entitled to pre-judgment interest for backpay, past emotional distress damages, and past medical expenses at the statutory rate set forth in Iowa Code § 668.13(3), with interest accruing from the date of the commencement of her action. As a prevailing party in federal court, Baker is entitled to post-judgment interest on each of her awards. *See* 28 U.S.C. § 1961(a). Federal law, under 28 U.S.C. § 1964, governs post-judgment interest on these awards, and post-judgment interest in this case shall be calculated in accordance with 28 U.S.C. § 1961(a).

THEREFORE, the clerk of court shall enter an amended judgment in this case in the amount of **$1,172,784.97,** plus pre-judgment interest on her backpay, past emotional distress awards, and past medical expenses and post-judgment interest on the entire award, which reflects the following:

| COMPENSATORY DAMAGES<br>*Each compensatory award is allocated to<br>Baker's claims under Iowa Code ch. 216* | AMOUNT | Pre-judgment interest? | Post-judgment interest? |
| --- | --- | --- | --- |

| | | | AMOUNT | Pre-judgment interest? | Post-judgment interest? |
|---|---|---|---|---|---|
| | Sexual harassment | Past emotional distress | $250,000.00 | Yes | Yes |
| | | Future emotional distress | $ 50,000.00 | No | Yes |
| | Retaliation | Past emotional distress | $ 75,000.00 | Yes | Yes |
| | | Future emotional distress | $ 10,000.00 | No | Yes |
| | Constructive discharge | Past emotional distress | $150,000.00 | Yes | Yes |
| | | Future emotional distress | $200,000.00 | No | Yes |
| Medical expenses | Sexual harassment | Past medical expenses | $ 14,470.24 | Yes | Yes |
| | | Future medical expenses | $ 90,000.00 | No | Yes |
| Backpay | | | $ 33,314.73 | Yes | Yes |

| PUNITIVE DAMAGES *Allocated to Baker's Title VII claims* | | AMOUNT | Pre-judgment interest? | Post-judgment interest? |
|---|---|---|---|---|
| | | $300,000.00 | No | Yes |

**IT IS SO ORDERED.**